STATE OF NORTH CAROLINA v. JASON WAYNE HURST

No. 363A04

(Filed 27 January 2006)

## 1. Jury— motion for mistrial—prospective juror brought newspaper article dealing with trial into jury room during jury selection—admonition to jury

The trial court did not abuse its discretion in a first-degree murder case by denying defendant's motion for a mistrial based on the fact that a prospective alternate juror brought a newspaper article dealing with the trial into the jury room during jury selection, because: (1) none of the twelve jurors selected for the sitting panel were in the jury room by the time the article appeared there, and defendant had not shown the substantial and irreparable harm required by N.C.G.S. § 15A-1061 for declaration of a mistrial; (2) the trial court's findings that the original jury was not tainted and its subsequent denial of defendant's motion for a mistrial was not so arbitrary that it could not have been the result of a reasoned decision; (3) the trial court's questioning was sufficient to support it's findings that the regular jury was not exposed to the article and was fully adequate under our law; (4) none of the alternate jurors participated in the deliberations at defendant's trial, and thus, even if alternate jurors were exposed to the article, any resulting taint was immaterial and caused defendant no prejudice; (5) a defendant claiming error in the trial court's admonitions pursuant to N.C.G.S. § 15A-1236(a) must object in order to preserve the issue for appeal, and defendant acknowledges that no such objection was raised; and (6) defendant also failed to establish that he suffered prejudice as a result of any failure of the trial court to admonish the jury when the trial court's admonition in this case specifically advised the prospective jurors that if they were selected for the jury, they were not to read media reports about the case.

## 2. Sentencing— capital—mitigating circumstances—no significant history of prior criminal activity—failure to give instruction

The trial court did not err by failing to submit the statutory mitigating circumstance under N.C.G.S. § 15A-2000(f)(1) that defendant has no significant history of prior criminal activity and by instead submitting a similar nonstatutory mitigating circum-

STATE v. HURST

[360 N.C. 181 (2006)]

stance requested by defendant that prior to this offense the defendant had no significant history of violent criminal activity, because: (1) although a trial court's failure to submit a statutory mitigating circumstance that is supported by sufficient evidence is prejudicial error unless the State can demonstrate that the error was harmless beyond a reasonable doubt, no juror found this nonstatutory mitigating circumstance in light of the court's correct oral articulation of the mitigating circumstance, its provision to the jury of written copies of the instructions, its general instruction to answer "no" if the jury did not find the circumstance, and the additional specific wording in the verdict form that none of the jurors found this particular mitigating circumstance to exist; (2) although the doctrine of invited error does not apply, a whole record review will necessarily include consideration of the parties' positions as to whether the instruction should be given, and defendant asked the trial court not to instruct on the (f)(1) statutory mitigating circumstance; (3) the evidence presented at the trial sufficiently supported the trial court's threshold determination that no rational jury could find that defendant's criminal activity was insignificant; and (4) to the extent *State v. Rouse*, 339 N.C. 59 (1994), conflicts with other decisions on this point and our Supreme Court's holding in this case to the effect that an (f)(1) instruction may be given on the basis of any relevant evidence in the record, no matter how derived or presented, it is overruled.

**3. Sentencing— capital—mitigating circumstances—age at time of offense**

The trial court did not err in a first-degree murder case by failing to submit the N.C.G.S. § 15A-2000(f)(7) mitigating circumstance to the jury concerning defendant's age at the time of the offense which was twenty-three years old, because: (1) our Supreme Court will not conclude that the trial court erred in failing to submit the age mitigator where evidence of defendant's emotional immaturity is counterbalanced by other factors such as defendant's chronological age, defendant's apparently normal intellectual and physical development, and defendant's lifetime experience; and (2) the record demonstrated that defendant's maturity was consistent with his chronological age and other factors counterbalance defendant's evidence of emotional immaturity including defendant agreeing to help others financially and his polite nature.

**4. Sentencing— capital—defendant's argument—premeditation and deliberation—victim's perceptions—aggravating circumstances—murder especially heinous, atrocious, or cruel**

The trial court did not err in a first-degree murder case by failing to intervene ex mero motu during portions of the prosecution's closing argument in the sentencing proceeding that allegedly improperly encouraged the jurors to recommend death on the basis of evidence introduced in the guilt phase of the trial to support the elements of premeditation and deliberation, because: (1) evidence presented during the guilt phase is competent for the jury's consideration in the sentencing proceeding, and thus, the State may reargue evidence that justified the murder conviction to support the finding of an aggravating circumstance; (2) the fact that a murder was planned may be a factor in determining whether the murder was especially heinous, atrocious, or cruel; and (3) arguments addressing the victim's perceptions are relevant to the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

**5. Sentencing— death penalty—proportionate**

The trial court did not err in a first-degree murder case by sentencing defendant to death, because: (1) although defendant contends the sentence was imposed under the influence of passion, prejudice, and other arbitrary factors, this argument restates four issues previously discussed and our Supreme Court found no error as to these issues individually or considering them cumulatively; (2) the evidence indicated that defendant began planning to kill the victim as soon as their telephone conversation ended the day before the murder, that defendant urged the victim to walk into a field for the ostensible purpose of setting up targets and then shot him without provocation, that the victim asked defendant not to shoot him again, that defendant fired three spaced shots into the victim, that the third shot was fired into the victim's head as the victim lay helpless watching defendant, that defendant took the victim's keys from his body after shooting him and drove his car to West Virginia, that defendant traded or sold the victim's two guns, and that defendant acknowledged that he felt no remorse; (3) the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel is sufficient, standing alone, to affirm the death sentence; and (4) defendant was found

guilty of first-degree murder on the basis of premeditation and deliberation, and also on the basis of felony murder.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge John O. Craig, III on 17 March 2004 in Superior Court, Randolph County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 19 October 2005.

*Roy Cooper, Attorney General, by Valérie B. Spalding, Special Deputy Attorney General, for the State.*

*Staples S. Hughes, Appellate Defender, by Anne M. Gomez, Assistant Appellate Defender, for defendant-appellant.*

EDMUNDS, Justice.

Defendant Jason Wayne Hurst was indicted on 19 August 2002 for killing Daniel Lee Branch. Defendant was found guilty of first-degree murder both on the basis of malice, premeditation and deliberation and on the basis of felony murder. Following a capital sentencing proceeding, the jury found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and recommended a sentence of death. The trial court entered judgment on 17 March 2004.

On 9 June 2002, Daniel Branch told his wife Barbara that he and defendant were going to travel to Asheboro. According to Barbara, defendant was an acquaintance who was supposed to help Branch sell some firearms. After loading several long guns into his 1977 blue Thunderbird, Branch left home around 11:00 or 11:30 that morning. She never saw him alive again.

The next day, Barbara filed a missing persons report and Detective Kevin Ray of the High Point Police Department began an investigation. On 11 June 2002, while pursuing a lead that defendant had been seen in West Virginia driving a Thunderbird matching the description of Branch's vehicle, Detective Ray discovered that defendant had been romantically involved with Kim Persinger in West Virginia and that she was pregnant with his child. Kim's brother indicated to Detective Ray that Branch had been killed in North Carolina and that his body was in a field near the Montgomery and Randolph County line.

Detective Ray and High Point Police Detective Lieutenant Dick Shuping searched a large, cleared tract of land at the described loca-

**STATE v. HURST**

[360 N.C. 181 (2006)]

tion and found the body of Daniel Branch. The victim was lying on his back and one of his pockets had been pulled out. The investigators observed that he appeared to have suffered gunshot wounds to the torso and head. Two expended shotgun shell casings were found near his body.

That same day, state police and sheriffs in West Virginia began searching for defendant and the victim's blue Thunderbird. Acting on a tip, investigators located both at a convenience store near Rock Creek, where defendant was taken into custody without incident. During the arrest, defendant stated that "he was just glad that it was over" and that "he had killed a guy in North Carolina." Even though he was given his *Miranda* warnings, defendant continued to talk, repeating that he had killed a man in North Carolina with a shotgun and brought his car to West Virginia. Shortly thereafter, the arresting officers allowed defendant to visit the Persinger residence, where he spoke briefly with Kim and other members of her family. Defendant was then transported to the state police detachment in Beckley, where he again was advised of his *Miranda* rights. After waiving those rights, defendant confessed to the murder of Daniel Branch.

In his confession, defendant said that he knew Branch from having traded guns with him in the past. Defendant claimed that the victim called him the day before the murder and asked him to meet to trade some guns. Defendant said that "[he] knew [he] was going to kill [Branch]" as soon as their telephone conversation ended and "began to plan." The next day, defendant met Branch at the field where the killing occurred to purchase a twelve-gauge Mossberg pump shotgun. When defendant asked Branch if he could test-fire the weapon, the victim agreed. At defendant's urging, Branch walked into the field to set up some cans and bottles. As he did, defendant opened fire, shooting the victim three times.

After the first shot, which defendant indicated struck Branch in the ribs or stomach, the victim yelled "no, no, don't shoot," and turned to run. Defendant shot Branch again, hitting him in the side and causing him to fall. Defendant then walked toward the victim and shot him in the head. After the final shot, defendant reached into the victim's pocket, took his keys, and left the scene in Branch's car. An autopsy confirmed that Branch had suffered shotgun wounds in his lower left chest and abdominal area, in his right side, and in his right jaw.

Defendant told the officers that the Mossberg shotgun was at the house of a relative, Leon Burgess, where he had traded it for a .410 gauge shotgun. Burgess later confirmed the trade and gave the murder weapon to the investigators. A .410 gauge shotgun was recovered from the victim's Thunderbird that defendant had been driving when arrested. Defendant also stated that he had sold Branch's .22 caliber rifle.

During the interview, defendant said that the victim had not provoked or threatened him and declined to give a reason for the shooting. He said he did not know the victim that well, but that he was "an okay guy." Defendant stated that he was not sorry for killing Branch but that he felt sorry for the victim's family.

Defendant did not testify at trial. During the guilt phase of the trial, he presented instead James H. Hilkey, Ph.D., an expert forensic psychologist, who testified that defendant suffered from borderline personality disorder, traits of antisocial personality disorder, and depression. Dr. Hilkey stated that, in his opinion, defendant's psychological disorders "affected his ability to weigh and consider the consequences of his actions and to form specific intent to kill." Dr. Hilkey was also of the opinion that at the time of the shooting, defendant "was under the influence of a mental or emotional disturbance and his capacity to conform his conduct to the requirements of the law was impaired." However, Dr. Hilkey also testified that defendant's "clearly average" I.Q. was 104 and that he knew killing the victim was wrong. Dr. Hilkey found no signs that defendant suffered from neurological damage or distortions.

Additional facts will be set forth as necessary for the discussion of specific issues.

## JURY SELECTION

[1] Defendant contends he is entitled to a new trial because the trial court failed to take appropriate action when it learned that a prospective alternate juror brought a newspaper article dealing with the trial into the jury room during jury selection. The record indicates that jury selection commenced on Tuesday, 2 March 2004, and by mid-morning Friday, 5 March 2004, twelve jurors had been seated. After consulting with counsel for the State and for defendant, the trial court elected to select three alternate jurors. Selection of the alternates began after the morning recess that same Friday and continued into the afternoon. After one alternate was chosen, prospective alternate juror Paul Biedrzycki was called. During *voir dire*, Biedrzycki

stated that he had read a newspaper article concerning the case in the jury room "about half an hour ago." Biedrzycki was excused for cause, then questioned in greater detail as to the newspaper in the jury room. He explained that someone in the jury room had been reading a local newspaper article about the trial and he had asked if he could read it. The headline of the article was to the effect that defendant admitted guilt. Biedrzycki added that the newspaper had not been present in the room on either of the preceding days but was there when he returned to the jury room that afternoon.

Defense counsel moved for a mistrial based on the article's contents and the jury's disobedience of the trial court's prior instructions not to read any extraneous material. After hearing arguments from defendant and the State, the trial court observed that the twelve jurors already chosen had left the courthouse by the time the article appeared in the jury room, and denied the motion. Shortly thereafter, the trial court brought the remaining prospective alternate jurors into the courtroom, explicitly instructed them not to read any press accounts about the case nor bring any newspapers to court, then excused them for the weekend recess. The court also made arrangements to ensure that the prospective alternates who were scheduled to arrive the following Monday would not mix with the jurors who had already been chosen. The bailiff then retrieved the newspaper from the jury room and the court admitted into evidence as a pretrial exhibit the 5 March 2004 Randolph County edition of the *News & Record* that contained an article headlined "High Point man admits to killing."

The following Monday, sixteen prospective alternate jurors were individually questioned. Several reported that they had seen or read the article or heard it discussed in the jury room on the preceding Friday. One of the twelve admitted bringing newspapers into the jury room every day but added that the Friday paper was the only one that any other juror had borrowed and read. Of the two alternate jurors that were selected from this pool of twelve, one had read the Friday article but had heard no discussion about it and said he could disregard what he had read. The other said that he had seen but not read the newspaper and had not observed anyone else reading it.

We first address defendant's argument that the trial court erred in denying his motion for a mistrial. Upon motion by a defendant, "[t]he judge must declare a mistrial . . . if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to

the defendant's case." N.C.G.S. § 15A-1061 (2005). "The decision to grant or deny a mistrial rests within the sound discretion of the trial court" and will be reversed on appeal only upon "a clear showing that the trial court abused its discretion." *State v. Bonney*, 329 N.C. 61, 73, 405 S.E.2d 145, 152 (1991). Thus, a mistrial should not be allowed unless " 'there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial verdict.' " *Id.* (citation omitted).

When the trial court initially denied defendant's motion for a mistrial on Friday, 5 March 2004, it stated:

> Well, I'm going to note that by the time according to this juror, by the time the newspaper appeared in the jury pool room there were none of the twelve jurors present, they had all been sent home. So at least as to the twelve jurors it does. not taint them. We will probably have to ask the remaining ones about the newspaper, and I am going to instruct them.
>
> . . . .
>
> . . . Because we only have seated one alternate, the others were not present at the time this alleged newspaper got loose in the jury room. I do not believe at this point that the defense has shown substantial and irreparable harm under the statute, and so in my discretion I am denying the motion for a mistrial.

The following Monday, defendant twice renewed his mistrial motion during the examination of prospective alternate jurors. The trial court again denied it on similar grounds:

> The motion, in my discretion, is denied on the same grounds as I stated on Friday. We have twelve jurors that were seated who were not present in the jury room at the time these discussions took place, so they have presumably not been tainted. We have one alternate seated that was not tainted. And I'm going to continue to go through these alternate jurors, and I will allow you to ask questions, but at this point, while there certainly appears to have been some potential juror misconduct, it has not affected the twelve jurors that were seated to be the actual tryers [sic] of the facts in this case.

The court then completed selection of alternate jurors.

Although defendant argues that insufficient evidence existed to support the trial court's findings, our review of the record reveals no abuse of discretion. At the close of court on Thursday, 4 March 2004, ten jurors had been selected. The final two jurors were seated the morning of Friday, 5 March 2004, then excused until the following Monday. The court reconvened on the afternoon of that same Friday to select three alternate jurors. After alternate juror Anna Frye was chosen, prospective alternate juror Biedrzycki mentioned the newspaper in the jury room, advising the trial court that "[i]t was only there . . . the last half hour or hour" and that "[t]here was nothing in there yesterday or the day before." This testimony provided initial support for the trial court's finding that none of the twelve jurors selected for the sitting panel were in the jury room by the time the article appeared there and that defendant had not shown the substantial and irreparable harm required by N.C.G.S. § 15A-1061 for declaration of a mistrial.

As to the prospective alternates who were examined on Monday, 8 March 2004, defendant focuses on the testimony of Donald Reese, who eventually was excused for cause unrelated to the newspaper. On *voir dire*, Reese stated that he had read the article in the Friday newspaper and that he was responsible for the newspaper's appearance in the jury room. He also reported that he had brought a newspaper to court every day during jury selection and had overheard conversations about the case. However, Reese added that, except for the first day of jury selection when one juror borrowed the first page but then was "called in [the courtroom] right away," no one asked to borrow his newspaper until Friday, the day he heard the jurors' discussions. In addition, while other prospective alternate jurors questioned on Monday expressed some knowledge of the article or had overheard discussions in the jury room from the preceding Friday, none stated definitively that the newspaper was present in the room before Friday afternoon.

This evidence is consistent with the *voir dire* testimony of James Phillips and Sheila Thompson, the final two regular jurors selected on Friday morning. Both were asked whether they had read, heard, or watched any news reports or heard discussions about the case. Phillips answered the question in the negative and made no mention of the article. Thompson similarly made no comment about any newspaper article in the jury room, stating that her only familiarity with the case came through overhearing general discussions "long ago" when the crime actually happened. Thus, our review of the record

demonstrates that the trial court's findings that the original jury was not tainted and its subsequent denial of defendant's motion for mistrial was not " ' "so arbitrary that it could not have been the result of a reasoned decision." ' " *State v. Diehl*, 353 N.C. 433, 437, 545 S.E.2d 185, 188 (2001) (citation omitted).

Defendant next argues that the trial court's inquiry concerning the newspaper article was inadequate and that as a result the court had insufficient information from which to determine whether defendant had been prejudiced. This Court has held that " '[w]hen there is a substantial reason to fear that the jury has become aware of improper and prejudicial matters, the trial court must question the jury as to whether such exposure has occurred and, if so, whether the exposure was prejudicial.' " *State v. Campbell*, 340 N.C. 612, 634, 460 S.E.2d 144, 156 (1995) (quoting *State v. Barts*, 316 N.C. 666, 683, 343 S.E.2d 828, 839 (1986)) (alteration in original), *cert. denied*, 516 U.S. 1128, 133 L. Ed. 2d 871 (1996).

Here, once the issue of the article came to the trial court's attention, it determined who had been exposed to the article. After concluding that only prospective alternate jurors might have been affected, the court and counsel questioned each subsequent prospective alternate juror individually about exposure and possible prejudice. Defendant points out that even if the article had been in the jury room only on Friday, the last two panelists seated as regular jurors that day were not asked specifically if they had seen the article. However, as detailed above, the court made findings at the outset of its inquiry that none of the regular jurors had seen the article. The record fully supports this finding. In addition, both of these jurors were asked on *voir dire* if they had seen or read any news reports about the case, and both answered in the negative. This questioning was sufficient to support the trial court's findings that the regular jury was not exposed to the article and was fully adequate under our law. *See Bonney*, 329 N.C. at 83, 405 S.E.2d at 158.

Moreover, none of the alternate jurors participated in the deliberations at defendant's trial. Thus, even if alternate jurors were exposed to the article, any resulting taint was immaterial and caused defendant no prejudice. *See State v. Blakeney*, 352 N.C. 287, 301-02, 531 S.E.2d 799, 811 (2000) (noting that when an alternate juror, who admitted to having read a newspaper article about the case, did not participate in deliberations, and when no participating juror was exposed to the article, the defendant failed to demonstrate prejudice from the trial court's denial of his motion for a continuance or that

the trial court abused its discretion), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). Accordingly, defendant's argument that he suffered "substantial and irreparable prejudice" fails. This assignment of error is overruled.

Defendant next makes the related argument that the trial court's admonition to the prospective jurors on the second panel brought before the court was incomplete and misleading and allowed them to view the allegedly prejudicial newspaper article about the trial. On Wednesday morning, 3 March 2004, the second panel of prospective jurors was brought into the courtroom. The trial court considered requests for deferrals, administered the oath, and instructed the panel. Before excusing this panel for lunch, the trial court stated:

I will instruct you during the jury selection process in this case that if you are selected to serve as a juror, throughout the trial you should not read, watch, or listen to any news media reports about this case. You should not discuss this case with anyone else, including other jurors, your spouses, family members, or friends, or have any contact with the lawyers, the parties, or the witnesses in this matter, and that includes me as well.

Defendant maintains that this admonition, which was the only one this panel received as prospective jurors, did not meet the requirements of N.C.G.S. § 15A-1236(a). That statute sets out the admonitions that a trial court must give jurors at appropriate times. We will assume without deciding that these admonitions apply as well to prospective jurors.

In *State v. Thibodeaux*, we observed that a defendant claiming error in the trial court's admonitions pursuant to N.C.G.S. § 15A-1236(a) "must object . . . in order to preserve [the] issue for appeal." 341 N.C. 53, 62, 459 S.E.2d 501, 507 (1995). Defendant acknowledges that no such objection was raised. In addition, the defendant also "must establish that he suffered prejudice as a result of any failure of the trial court to admonish the jury." *Id.* As detailed above, we are satisfied from our review of the record that the trial court conducted an adequate inquiry and correctly concluded that none of the seated jurors who participated in deliberations were present in the jury room when the newspaper article was read and discussed by the prospective alternate jurors. The admonition quoted above specifically advised the prospective jurors that, if they were selected for the jury, they were not to read media reports about the case. The record indicates that none of the deliberating jurors saw or

read the article. Therefore, defendant has failed to demonstrate prejudice. This assignment of error is overruled.

## SENTENCING ISSUES

[2] Defendant raises several issues relating to sentencing. Defendant assigns error to the trial court's decision not to submit the statutory mitigating circumstance that "[t]he defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1) (2005). Defendant contends that by submitting a similar nonstatutory mitigating circumstance, the trial court violated his federal and state constitutional rights and that he is entitled to a new sentencing hearing.

At the sentencing proceeding charge conference, defendant's counsel presented to the trial court a list of requested mitigating circumstances, including instructions on the N.C.G.S. § 15A-2000(f)(2) ("[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance") and (f)(6) ("[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired") statutory mitigating circumstances. Defendant also asked the trial court not to instruct on the (f)(1) statutory mitigating circumstance. Instead, defendant requested that the court instruct on a proposed nonstatutory mitigating circumstance, that "[p]rior to this offense, the defendant had no significant history of violent criminal activity." In addition, defendant requested that the trial court instruct as to fifteen other nonstatutory mitigating circumstances. The trial court agreed not to give the (f)(1) instruction and further agreed to instruct peremptorily as to all of defendant's proposed statutory and nonstatutory mitigating circumstances.

Although the court verbally instructed the jury that it could consider whether "[p]rior to this offense, the defendant had no significant history of violent criminal activity," the circumstance was printed in the verdict sheet as "[p]rior to this offense, did the defendant have a significant history of violent criminal activity?" Defendant argues that the discrepancy between these formulations of the mitigating circumstance makes ambiguous the answer "No" that the jury wrote on the verdict sheet. However, in light of the court's correct oral articulation of the mitigating circumstance, its provision to the jury of written copies of the instructions, its general instruction to answer "No" if the jury did not find the circumstance, and the additional specific wording in the verdict form that none of the jurors

found this particular mitigating circumstance to exist, we are satisfied that no juror found this nonstatutory mitigating circumstance.

Defendant now argues that the trial court erred when it acceded to his request not to submit the (f)(1) statutory mitigating circumstance to the jury. Defendant contends that the trial court's failure to provide this instruction was prejudicial error that entitles him to a new sentencing proceeding.

Before we address defendant's contention, we believe it appropriate to reexamine how our jurisprudence has developed around the (f)(1) mitigating circumstance. North Carolina's capital punishment statute provides that:

> In all cases in which the death penalty may be authorized, the judge *shall* include in his instructions to the jury that it *must* consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsections (e) and (f) which may be supported by the evidence, and shall furnish to the jury a written list of issues relating to such aggravating or mitigating circumstance or circumstances.

N.C.G.S. § 15A-2000(b) (2005) (emphases added). By "unequivocally set[ting] forth the legislature's intent that in every case the jury be allowed to consider all statutory aggravating or mitigating circumstances which the jury might reasonably find supported by the evidence," this section ensures that jury consideration in capital cases is properly guided. *State v. Lloyd*, 321 N.C. 301, 312, 364 S.E.2d 316, 324, *judgment vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988).

Applying N.C.G.S. § 15A-2000(b) in the context of the (f)(1) mitigating circumstance, we have held that the trial court has no discretion and must submit the statutory circumstance when sufficient supporting evidence is presented. *See, e.g., State v. Parker*, 354 N.C. 268, 292, 553 S.E.2d 885, 902 (2001) ("trial court must submit"), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002); *State v. Hamilton*, 351 N.C. 14, 23, 519 S.E.2d 514, 520 (1999) ("trial court has no discretion"), *cert. denied*, 529 U.S. 1102, 146 L. Ed. 2d 783 (2000); *State v. McNeil*, 350 N.C. 657, 683, 518 S.E.2d 486, 502 (1999) (" 'trial court is required to submit' ") (citation omitted), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000); *State v. Walker*, 343 N.C. 216, 223, 469 S.E.2d 919, 922 ("trial court has no discretion; the . . . circumstance must be submitted"), *cert. denied*, 519 U.S. 901, 136 L. Ed. 2d

180 (1996); *Lloyd,* 321 N.C. at 311, 364 S.E.2d at 323 ("trial court is mandated . . . to submit"); *see also State v. Hucks,* 323 N.C. 574, 579-80, 374 S.E.2d 240, 244 (1988) (holding that a court may have to act *sua sponte* to avoid a statutory violation in the absence of an objection by the parties). Sufficient supporting evidence exists to require the trial court to instruct on a statutory mitigating circumstance when the evidence is " 'substantial,' " *State v. Watts,* 357 N.C. 366, 377, 584 S.E.2d 740, 748 (2003) (addressing the (f)(4) statutory mitigating circumstance) (citation omitted), *cert. denied,* 541 U.S. 944, 158 L. Ed. 2d 370 (2004), and of such a nature that " 'a rational jury could conclude that defendant had no *significant* history of prior criminal activity,' " *State v. Barden,* 356 N.C. 316, 372, 572 S.E.2d 108, 143 (2002) (quoting *State v. Wilson,* 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988), *quoted in Blakeney,* 352 N.C. at 318, 531 S.E.2d at 821), *cert. denied,* 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). Further, "[w]e define 'significant' within the context of N.C.G.S. § 15A-2000(f)(1) as likely to have influence or effect upon the determination by the jury of its recommended sentence." *State v. Walls,* 342 N.C. 1, 56, 463 S.E.2d 738, 767 (1995), *cert. denied,* 517 U.S. 1197, 134 L. Ed. 2d 794 (1996).

Should the trial court find sufficient evidence to support the (f)(1) mitigating circumstance, it must give the instruction even over the defendant's objections. "If the trial court determines that a rational jury could find that defendant had no significant history of prior criminal activity, 'the statutory mitigating circumstance must be submitted to the jury, without regard to the wishes of the State or the defendant.' " *Barden,* 356 N.C. at 372, 572 S.E.2d at 143 (quoting *State v. Mahaley,* 332 N.C. 583, 597, 423 S.E.2d 58, 66 (1992), *cert. denied,* 513 U.S. 1089, 130 L. Ed. 2d 649 (1995)); *see also State v. Quick,* 337 N.C. 359, 361-62, 446 S.E.2d 535, 537 (1994) ("Regardless of whether defendant requests submission of this mitigating circumstance or objects to its submission to the jury, mitigating circumstance (f)(1) must be submitted to the jury where the trial court determines the mitigating circumstance is supported by the evidence."). Accordingly, the doctrine of invited error cannot apply when the instruction is withheld at the defendant's request. A trial court's failure to submit a statutory mitigating circumstance that is supported by sufficient evidence is prejudicial error unless the State can demonstrate that the error was harmless beyond a reasonable doubt. *State v. Fletcher,* 348 N.C. 292, 328, 500 S.E.2d 668, 689 (1998), *cert. denied,* 525 U.S. 1180, 143 L. Ed. 2d 113 (1999).

In addition, we have held that where evidence supports submission of the (f)(1) statutory mitigating circumstance, a trial court errs by substituting a similar nonstatutory mitigating circumstance. *State v. Jones*, 346 N.C. 704, 717, 487 S.E.2d 714, 722-23 (1997). The reason is that a jury may find that a nonstatutory mitigating circumstance exists but has no mitigating value, while a statutory mitigating circumstance, if found, automatically has mitigating value. *Quick*, 337 N.C. at 364, 446 S.E.2d at 538.

Application of these holdings in a manner consistent with the intent of North Carolina's capital sentencing scheme has proved to be difficult. A capital jury is obligated to weigh statutory and nonstatutory mitigating circumstances, which (at least theoretically) redound to the defendant's favor,[1] against statutory aggravating circumstances, which make the offense more grave. Only when the jury finds that the balance of circumstances goes against the defendant as set out in N.C.G.S. § 15A-2000 may it recommend a sentence of death. Something has gone awry in this carefully wrought process when the ostensibly mitigating (f)(1) circumstance, meant to draw the jurors' attention to a factor potentially favorable to a defendant, is with some frequency being given over the defendant's objections. *See generally* Ashley P. Maddox, *North Carolina's (f)(1) Mitigating Circumstance: Does It Truly Serve to Mitigate?*, 26 Campbell L. Rev. 1 (2004).

We must acknowledge that our holdings interpreting the application of N.C.G.S. § 15A-2000(f)(1) may have given rise to this unfortunate situation. Two cases stand out. In *State v. Brown*, the capital defendant previously had been convicted of six counts of felonious breaking or entering, six counts of felonious larceny, five counts of armed robbery, and one count of felonious assault. 315 N.C. 40, 62, 337 S.E.2d 808, 824 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *and overruled in part on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). *Brown* appears to be the first case in which the jury was instructed as to the (f)(1) mitigating circumstance over the defendant's objection. Noting that the convictions were approximately twenty years old, we found no error in the trial court's instructions. *Id.* at 62-63, 337 S.E.2d at 825. Later,

---

1. We have defined a mitigating circumstance more formally as "a fact or group of facts which do not constitute any justification or excuse for killing or reduce it to a lesser degree of the crime of first-degree murder, but which may be considered as extenuating, or reducing the moral culpability of the killing, or making it less deserving of the extreme punishment than other first-degree murders." *State v. Irwin*, 304 N.C. 93, 104, 282 S.E.2d 439, 446-47 (1981).

in *State v. Lloyd*, the defendant previously had been convicted of felony " 'assault with intent to rob not being armed' " and of felony " 'breaking and entering a business place with intent to commit larceny.' " 321 N.C. at 312, 364 S.E.2d at 324. Both offenses were approximately twenty years old. The defendant also had been convicted of seven alcohol-related misdemeanors over a more recent eleven year period. *Id.* We held that despite the defendant's objection the trial court had properly found that a jury reasonably could conclude that this record did not constitute a significant history of prior criminal activity and that the (f)(1) instruction had been properly given. *Id.* at 313, 364 S.E.2d at 324.

Following our holdings in *Brown* and *Lloyd*, many trial judges have given the (f)(1) instruction even when the defendant has an extensive record. The resulting effect on our capital sentencing jurisprudence has been confusing at best and counterproductive at worst, as exemplified by *State v. Walker*, in which this Court felt obligated to admonish prosecutors not to argue that a defendant had requested a mitigating circumstance when in fact the defendant had objected to the circumstance. 343 N.C. at 223, 469 S.E.2d at 923. We went on to observe that

> the better practice when a defendant has objected to the submission of a particular mitigating circumstance is for the trial court to instruct the jury that the defendant did not request that the mitigating circumstance be submitted. In such instances, the trial court also should inform the jury that the submission of the mitigating circumstance is required as a matter of law because there is some evidence from which the jury could, but is not required to, find the mitigating circumstance to exist.

*Id.* at 223-24, 469 S.E.2d at 923; *see also State v. Bell*, 359 N.C. 1, 39-40, 603 S.E.2d 93, 118-19 (2004), *cert. denied*, —— U.S. ——, 161 L. Ed. 2d 1094 (2005).

We believe that *Brown, Lloyd,* and other similar cases have resulted in a distortion of capital sentencing as our trial courts have focused too closely on the existence, nature, and extent of a defendant's record and have correspondingly failed to consider the aspect of our holdings that allows the court to determine whether a reasonable jury would find the defendant's criminal activity to be significant. *See Blakeney,* 352 N.C. at 319, 531 S.E.2d at 821 (stating that the trial court's focus " 'should be on whether the criminal activity is such as to influence the jury's sentencing recommendation' ") (citation omit-

ted); *Wilson*, 322 N.C. at 143, 367 S.E.2d at 604 (stating that the test for giving (f)(1) instruction is whether the defendant's prior criminal activity was so significant that no rational jury could find the existence of the mitigating circumstance). *Blakeney* and *Wilson* are entirely consistent with N.C.G.S. § 15A-2000(b), which requires the trial court to make an initial determination as to which mitigating circumstances are supported by the evidence.

Our trial judges are capable of making sensible assessments. We reaffirm that the (f)(1) circumstance must be submitted whenever the trial court finds substantial evidence on which a reasonable jury could determine that a defendant has no significant history of prior criminal activity. However, when the judge makes a threshold determination supported by findings on the record that no rational jury could find a defendant's criminal history to be insignificant and declines to instruct as to (f)(1), that determination is entitled to deference. Therefore, whenever a party contends that the trial court erred in deciding not to provide an (f)(1) instruction, we will review the whole record in evaluating whether the trial court acted correctly, bearing in mind our admonition that "any reasonable doubt regarding the submission of a statutory or requested mitigating factor [should] be resolved in favor of the defendant." *Brown*, 315 N.C. at 62, 337 S.E.2d at 825. Although the doctrine of invited error does not apply, as noted above, a whole record review will necessarily include consideration of the parties' positions as to whether the instruction should be given.

Our holding today is intended to be a clarification of, not a departure from, our jurisprudence pertaining to the (f)(1) statutory mitigating circumstance. We do not foresee, and will not countenance, the replacement of this or any other statutory mitigating circumstances with somewhat similar nonstatutory circumstances. The constitutionality of North Carolina's capital sentencing scheme depends upon jurors having guided discretion as they consider the appropriate sentence to recommend. *See State v. McCarver*, 341 N.C. 364, 392, 462 S.E.2d 25, 41 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996); *State v. McKoy*, 323 N.C. 1, 42-43, 372 S.E.2d 12, 35 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). Because jurors will still be instructed as to the (f)(1) statutory circumstance whenever a defendant's criminal activity may reasonably be found not to be significant, today's holding serves only to remove the quirks that have crept into the (f)(1) aspect of capital sentencing without impinging either on the defendant's right to have all

applicable mitigating circumstances considered by the jury or on the judge's duty to instruct on all statutory and nonstatutory mitigating circumstances supported by reasonable evidence.

Turning to the case at bar, the evidence presented at trial indicated that defendant had broken into a residence in Rock Creek, West Virginia a few months before the instant murder and stolen a firearm; that in 1998 defendant had been convicted of "several" breaking and entering charges in North Carolina; that defendant abused marijuana, crack cocaine, and Oxycontin; and that a charge of driving under the influence was pending against defendant in West Virginia. Although other evidence suggested that defendant may have been involved in additional illegal activity, the information described above sufficiently supports the trial court's threshold determination that no rational jury could find that defendant's criminal activity was insignificant. Accordingly, the trial court did not err in deciding not to instruct pursuant to N.C.G.S. § 15A-2000(f)(1).

In reviewing our cases that address the (f)(1) mitigating circumstance, we note our anomalous opinion in *State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995). The State cited *Rouse* in support of its argument that the trial court's (f)(1) instructions were proper. In *Rouse*, we correctly held that when the record is silent as to a defendant's criminal history, no (f)(1) instruction is appropriate. *Id.* at 100, 451 S.E.2d at 566. However, we went on to imply that if the evidence pertaining to a defendant's criminal history is offered in a context other than for the purpose of determining whether an (f)(1) instruction should be given, the defendant might not be entitled to the instruction. *Id.* This implication is inconsistent with numerous other holdings of this Court to the effect that an (f)(1) instruction may be given on the basis of any relevant evidence in the record, no matter how derived or presented. *See, e.g., Quick*, 337 N.C. at 362, 446 S.E.2d at 537 ("Evidence in the present case, though not offered by defendant, tended to show that defendant had some history of prior criminal activity."); *Wilson*, 322 N.C. at 143, 367 S.E.2d at 604 ("Though defendant did not offer evidence supporting the submission of [the (f)(1)] mitigating circumstance, such evidence was in fact present in the record."); *State v. Stokes*, 308 N.C. 634, 652, 304 S.E.2d 184, 195-96 (1983) ("Even when a defendant offers no evidence to support the existence of a mitigating circumstance, the mitigating circumstance must be submitted when the State offers or elicits evidence from which the jury could reasonably infer that the circumstance exists."); *see also* N.C.G.S.

§ 15A-2000(a)(3) (2005) (stating that in the sentencing proceeding "there shall not be any requirement to resubmit evidence presented during the guilt determination phase . . . [and] all such evidence is competent for the jury's consideration in passing on punishment"). Accordingly, to the extent *Rouse* conflicts with other decisions on this point and our holding today, it is overruled. ·

**[3]** Defendant next contends that he is entitled to a new capital sentencing hearing because the trial court erred by failing to submit the N.C.G.S. § 15A-2000(f)(7) mitigating circumstance to the jury. This statutory mitigating circumstance calls upon the jury to consider defendant's age at the time of the offense. Although defendant did not request the submission of this circumstance, he now argues that (f)(7) was supported by evidence that defendant was twenty-three years old at the time of the crime and by evidence that he was emotionally immature.

At his sentencing proceeding, defendant presented several family members as witnesses. He also relied on Dr. Hilkey's testimony from the guilt phase of the trial. Defendant now directs us to Dr. Hilkey's diagnosis that defendant suffered from borderline personality disorder (BPD), exhibited traits associated with antisocial personality disorder, and suffered from major depressive disorder as a result of his upbringing. Defendant further notes that he presented evidence that he was raised in a "tumultuous" environment. Defendant's family history also indicated that his relationship with his parents was "extremely chaotic," that defendant's father physically abused and assaulted him and his mother, that defendant's parents suffered from mental health problems, and that defendant's father introduced defendant to alcohol and illegal drugs at an early age.

Dr. Hilkey testified that defendant's upbringing manifested itself as BPD when he grew older. Dr. Hilkey stated, *inter alia*, that defendant felt responsible for his parents' fighting; that defendant's family history was being replicated in his relationships; and that defendant felt unsure and unstable when not in a relationship, demonstrated reckless behavior and substance abuse, exhibited a "flat affect" or lack of emotional response to important events such as his role in the instant offense, and responded to events leading up to the murder by exhibiting a "transient depersonalization." Dr Hilkey added that defendant still hoped against all logic that his trial might bring his family together. According to Dr. Hilkey, defendant's slaying of Daniel Branch had no purpose other than allowing defendant to take the victim's car so he could travel to West Virginia to

reunite with Kim. In addition, defendant points to previous failed relationships with women that resulted in severe depression, instances of job truancy, and irresponsible substance abuse as evidence of emotional immaturity.

In determining whether the (f)(7) circumstance should have been submitted, "[w]e have recognized that chronological age is not the determinative factor." *State v. Meyer,* 353 N.C. 92, 100, 540 S.E.2d 1, 6 (2000), *cert. denied,* 534 U.S. 839, 151 L. Ed. 2d 54 (2001). Instead, "this Court considers age a 'flexible and relative concept.' " *State v. Thompson,* 359 N.C. 77, 99, 604 S.E.2d 850, 867 (2004) (quoting *State v. Johnson,* 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986)), *cert. denied,* —— U.S. ——, 163 L. Ed. 2d 80 (2005). Consequently, other " ' "varying conditions and circumstances" ' " must be considered, *State v. Peterson,* 350 N.C. 518, 528, 516 S.E.2d 131, 138 (1999) (citation omitted), *cert. denied,* 528 U.S. 1164, 145 L. Ed. 2d 1087 (2000), including "[t]he defendant's immaturity, youthfulness, or lack of emotional or intellectual development," *State v. Gainey,* 355 N.C. 73, 105, 558 S.E.2d 463, 483, *cert. denied,* 537 U.S. 896, 154 L. Ed. 2d 165 (2002). Nevertheless, we do not view "evidence showing emotional immaturity . . . in isolation, particularly where other evidence shows 'more mature qualities and characteristics.' " *Thompson,* 359 N.C. at 99, 604 S.E.2d at 867 (quoting *Johnson,* 317 N.C. at 393, 346 S.E.2d at 624, *quoted in State v. Spruill,* 338 N.C. 612, 660, 542 S.E.2d 279, 305 (1994), *cert. denied,* 516 U.S. 834, 133 L. Ed. 2d 63 (1995)). "Accordingly, this Court will not conclude that the trial court erred in failing to submit the age mitigator where evidence of defendant's emotional immaturity is counterbalanced by other factors such as defendant's chronological age, defendant's apparently normal intellectual and physical development, and defendant's lifetime experience." *State v. Steen,* 352 N.C. 227, 257, 536 S.E.2d 1, 19 (2000), *cert. denied,* 531 U.S. 1167, 148 L. Ed. 2d 997 (2001).

Although much of the evidence defendant cites to support the (f)(7) mitigating circumstance also supported the given (f)(2) and (f)(6) mitigating circumstances, the same evidence may support more than one mitigating circumstance. *State v. Zuniga,* 348 N.C. 214, 217-18, 498 S.E.2d 611, 613 (1998). If so, the jury must be instructed on all the applicable circumstances. *Id.* Nevertheless, despite defendant's arguments that his evidence establishes emotional immaturity, we believe the record demonstrates that his maturity was consistent with his chronological age. *See, e.g., State v. Bonnett,* 348 N.C. 417, 444, 502 S.E.2d 563, 581 (1998) (concluding

the trial court properly declined to submit the (f)(7) circumstance when the twenty-six-year-old defendant was abandoned at birth by his mother; grew up in a dysfunctional family; and had an I.Q. of 86, a learning disability, a lack of reading skills, and a significant lack of stability and guidance), *cert. denied*, 525 U.S. 1124, 142 L. Ed. 2d 907 (1999).

Moreover, other factors counterbalance defendant's evidence of emotional immaturity. Defendant's uncle testified that when he broke his leg during the summer of 1997, defendant "was right there for [him]" and did "everything" for him while he was recovering. When defendant was seventeen years old, he went to live with his cousin Teresa Gillespie so he could be closer to his job. Gillespie testified that defendant "was great with [her] son," regularly performed household chores, and even offered to help at Gillespie's parents' house. Not long thereafter, defendant began a relationship with a woman named Benita and was "crazy about" her baby Deandre. When Benita's mother left, defendant moved in to help with the finances, working double shifts to provide for Benita and Deandre. Kim Persinger's disabled father testified that while defendant was living with his family in West Virginia, he was "[p]olite all the time" and did "whatever needed [to be] done" around the house. Shortly before the murder, defendant told his sister he was moving back to North Carolina from West Virginia to put a home together for Kim and their child, that "he was done partying and . . . had to straighten up," that he had found a job, and that he was going to start saving for expenses. These facts illustrate defendant's " ' "more mature qualities and characteristics" ' " and that defendant "functioned emotionally as an adult." *Thompson*, 359 N.C. at 99, 604 S.E.2d at 867 (citation omitted); *see also Steen*, 352 N.C. at 258, 536 S.E.2d at 19 (recognizing such counterbalancing factors as the defendant's ability to manage financial transactions, his agreeing to help his mother financially, and his polite nature); *State v. Atkins*, 349 N.C. 62, 87, 505 S.E.2d 97, 113 (1998) (noting that the trial court did not err in failing to submit the (f)(7) mitigating circumstance even though the twenty-nine-year-old defendant had presented evidence that he suffered from a dissociative identity disorder and an attention deficit disorder, because "the record reveale[d] no evidence that defendant exhibited decisional skills and understanding equivalent to an adolescent" and "defendant had an IQ of 107, was functioning in the average to high-average range of intelligence, and had a relatively good understanding of social nuances"), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999).

In light of the foregoing evidence, we conclude that the trial court did not err in declining to submit the (f)(7) mitigating circumstance. This assignment of error is overruled.

[4] Defendant next assigns error to the trial court's failure to intervene *ex mero motu* during portions of the prosecution's closing argument in the sentencing proceeding. Defendant contends that the argument improperly encouraged the jurors to recommend death on the basis of evidence introduced in the guilt phase of the trial to support the elements of premeditation and deliberation. Defendant claims that by arguing this evidence during the sentencing proceeding, the State was encouraging the jurors to act on the basis of an aggravating circumstance that is not set out in N.C.G.S. § 15A-2000(e).

At the close of the guilt phase of the trial, the State argued that defendant had premeditated and deliberated before killing the victim. In support of this theory, one prosecutor, noting that defendant had lured the "totally innocent victim" to the death scene, emphasized that defendant had decided "to kill twenty-four hours earlier" and then "carried out his plan." Another prosecutor argued in the guilt phase "that there was no provocation by Daniel Branch" and that defendant acted according to "plan" by "tak[ing] a man to a place that is secluded where there's no other witnesses."

Later, at the sentencing proceeding, the trial judge agreed to submit the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance, that "[t]he capital felony was especially heinous, atrocious, or cruel." A portion of the State's closing argument at the sentencing proceeding as to this circumstance pointed out that "Daniel Branch was an innocent man. And the murder of an innocent man . . . fits all of [the] definitions" of heinous, atrocious, or cruel. The State went on to argue that "the plan, the luring of Daniel Branch to a secluded location" was an "evil element" of the crime. The State added:

> And let me just point out that the entire time that they're driving out to that field in extreme southern Randolph County, and the entire time that he's loading that shotgun, and the entire time that he's walking out he's watching Daniel Branch walk out into this field, the entire time the motive in his mind is to kill and to murder and to take the life of Daniel Branch. How do we know that? Because from his own mouth he said that I knew I was going to do it the day before. But if he knew he was going to do it the day before, if he knows with every passing moment that he's in the

car with Daniel Branch he knows that he's one minute closer to taking the life of this innocent man. He knows that every time he shoves a twelve-gauge shell into the gun, one, two, three, he is one step closer to killing Daniel Branch. Is that extremely wicked or shockingly evil? Is it outrageously wicked and vile?

The jury found this circumstance to exist.

Defendant concedes that he did not object to the argument at issue. Accordingly, we must determine whether " 'the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu.*' " *State v. Jones*, 358 N.C. 330, 349-50, 595 S.E.2d 124, 137 (quoting *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002)), *cert. denied*, 543 U.S. 1023, 160 L. Ed. 2d 500 (2004). This Court recently noted:

> Under this standard, "the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made."

*State v. Augustine*, 359 N.C. 709, 723, 616 S.E.2d 515, 526 (2005) (quoting *Jones*, 355 N.C. at 133, 558 S.E.2d at 107).

In a capital sentencing proceeding, the State is entitled to present " '[a]ny competent, relevant evidence which [will] substantially support the imposition of the death penalty.' " *State v. White*, 355 N.C. 696, 705, 565 S.E.2d 55, 61 (2002) (alterations in original) (citation omitted), *cert. denied*, 537 U.S. 1163, 154 L. Ed. 2d 900 (2003); *accord Brown*, 315 N.C. at 61, 337 S.E.2d at 824. Evidence presented during the guilt phase is competent for the jury's consideration in the sentencing proceeding. N.C.G.S. § 15A-2000(a)(3). Thus, the State may reargue evidence that justified the murder conviction to support the finding of an aggravating circumstance. *Cf. State v. Brown*, 306 N.C. 151, 176-77, 293 S.E.2d 569, 585-86 (holding that when the defendant is convicted of felony murder, the underlying felony merges with the murder and cannot be used as an aggravating circumstance), *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982).

We have also held that the fact that a murder was planned may be a factor in determining whether the murder was especially heinous,

atrocious, or cruel. *State v. Gibbs*, 335 N.C. 1, 63, 436 S.E.2d 321, 357 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). Moreover, the State argued several additional facts to support the (e)(9) aggravating circumstance, such as the manner in which the victim was killed:

> We've got the defendant tracking his target as he runs. Because we see that [he] ejected the second round far away from the first. And we know for a fact from his own statement that Daniel Branch was running for his life, which means that he's tracking him, he's running with him, he's cutting him off. Is that extremely wicked or shockingly evil after you've shot a man to track him like a dog, the[n] pump the shotgun to shoot him again? It is.
>
> Now, the final thing about the specific facts in the murder is the final shot to Daniel Branch's face. No, it is not a pretty thing to look at. But the important reason why I ask you to look at this is that Daniel Branch is in, when he looks up and he sees the final shot into his face, Daniel Branch is in the most defenseless position that a human being can be in. Daniel Branch is on his back. He has two shotgun blasts pumped into his body, and he's on his back. . . . Daniel Branch is on his back and his arms are in the surrender position. . . . And the testimony is that he's saying don't shoot me anymore. And he's shot. He's in the most defenseless position that a man can be in. And his arms are up because he's saying I surrender, I don't have a gun, I'm no longer any threat to you, don't shoot me anymore. . . . The evidence is that he [then] pulled the keys out of [the victim's] pocket after smelling the blood that he's spilled. . . . Is that extremely wicked, shockingly evil, outrageously wicked and vile? Did what he do inflict a high degree of pain with utter indifference to the suffering of Daniel Branch? Is this crime especially heinous, atrocious, and cruel?

Arguments addressing the victim's perceptions are relevant to the (e)(9) aggravator. *See State v. Golphin*, 352 N.C. 364, 480-81, 533 S.E.2d 168, 242-43 (2000) (noting that one type of murder warranting submission of the (e)(9) circumstance is that " 'which leave[s] the victim in her "last moments aware of but helpless to prevent impending death" ' " and that such facts, taken in a light most favorable to the State, existed in that case) (citations omitted), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). Accordingly, we conclude that the State's argument was proper and the trial court had no grounds to intervene *ex mero motu*. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises several additional issues that he concedes have been decided against him by this Court. First, defendant argues that he is entitled to a new capital sentencing hearing because the (e)(9) aggravating circumstance, that the murder was especially heinous, atrocious, or cruel, is unconstitutionally vague and overbroad, in violation of the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution. Although defendant does not characterize this issue as one of preservation, we treat the assigned error as such in light of our numerous decisions that have rejected a similar argument. *See, e.g., State v. Garcia,* 358 N.C. 382, 424, 597 S.E.2d 724, 753 (2004) (noting that this Court has consistently rejected the argument that the (e)(9) circumstance is unconstitutionally vague), *cert. denied,* 543 U.S. 1156, 161 L. Ed. 2d 122 (2005).

Defendant argues that the death penalty constitutes cruel and unusual punishment in violation of the North Carolina and United States Constitutions and the International Covenant on Civil and Political Rights, and that North Carolina's capital sentencing scheme is unconstitutionally vague and overbroad. This Court has held that the North Carolina capital sentencing scheme is constitutional, *State v. Powell,* 340 N.C. 674, 695, 459 S.E.2d 219, 230 (1995), *cert. denied,* 516 U.S. 1060, 133 L. Ed. 2d 688 (1996), and that it does not violate the International Covenant on Civil and Political Rights, *State v. Smith,* 352 N.C. 531, 566, 532 S.E.2d 773, 795 (2000), *cert. denied,* 532 U.S. 949, 149 L. Ed. 2d 360 (2001). Defendant argues that the trial court committed plain error in the sentencing proceeding by instructing the jury on unanimity in an ambiguous manner with respect to Issues Three and Four on the Issues and Recommendation as to Punishment form. We have resolved this issue contrary to defendant's position. *See McCarver,* 341 N.C. at 394, 462 S.E.2d at 42.

In addition, defendant assigns as plain error the trial court's instruction that the jury could reject nonstatutory mitigating circumstances on the ground that the circumstances had no mitigating value. Although defendant claims this instruction precludes the jury from considering the mitigating evidence fully, we have rejected this argument. *See, e.g., State v. Payne,* 337 N.C. 505, 533, 448 S.E.2d 93, 109-10 (1994), *cert. denied,* 514 U.S. 1038, 131 L. Ed. 2d 292 (1995). Defendant further contends that the trial court committed plain error by instructing the jury that each juror may only consider mitigating circumstances found by that juror rather than any mitigating circum-

stance found by any juror. We have held that the instruction given by the trial court is correct. *See, e.g., State v. Gregory*, 340 N.C. 365, 418-20, 459 S.E.2d 638, 669 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). Defendant asserts that the trial court erred when it instructed the jury that in considering Issues Three and Four, the jurors *may*, rather than *must*, consider mitigating circumstances found in Issue Two of the Issues and Recommendation as to Punishment form. We have approved this instruction as meeting the requirements of the statute. *State v. Skipper*, 337 N.C. 1, 51-52, 446 S.E.2d 252, 280 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995).

Furthermore, defendant assigns as plain error the trial court's instructions to the jury that defendant had the burden to *satisfy* it of the existence of mitigating circumstances. These instructions have been found proper. *Payne*, 337 N.C. at 531-33, 448 S.E.2d at 108-09. Defendant contends in a separate assignment of error that his death sentence violates the International Covenant on Civil and Political Rights and principles of international law. This Court has considered identical arguments and found them to be without merit. *See, e.g., Smith*, 352 N.C. at 566, 532 S.E.2d at 795. Defendant also contends that his constitutional rights were violated because the trial court tried him and entered judgment against him for first-degree murder when the indictment alleged only the elements of second-degree murder. This Court has held that the short-form indictment used in the present case is sufficient to charge a defendant with first-degree murder. *See, e.g., State v. Hunt*, 357 N.C. 257, 274-75, 582 S.E.2d 593, 604-05, *cert. denied*, 539 U.S. 985, 156 L. Ed. 2d 702 (2003). Defendant argues that his death sentence must be vacated because the indictment did not allege elements authorizing a sentence greater than life imprisonment without parole. We have repeatedly rejected the argument that aggravating circumstances must be alleged in a murder indictment. *See, e.g., State v. Allen*, 359 N.C. 425, 438, 615 S.E.2d 256, 265 (2005); *Hunt*, 357 N.C. at 277-78, 582 S.E.2d at 606. Defendant argues that the jury instructions were faulty because the jury was instructed to move on to Issue Four if it found in considering Issue Three that the aggravating and mitigating circumstances were in equipoise. We have rejected this argument and held that the instruction is proper. *See Golphin*, 352 N.C. at 468-69, 533 S.E.2d at 235-36.

Defendant raises these issues for the purpose of urging this Court to reconsider its prior decisions while also preserving his right to argue these issues on federal review. We have considered

STATE v. HURST

[360 N.C. 181 (2006)]

defendant's arguments on these additional issues and find no compelling reason to depart from our previous holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[5] In accordance with our statutory duty, we next consider: (1) whether the aggravating circumstances are supported by the record in this case; (2) whether the jury recommended the death sentence under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2005).

The jury found as aggravating circumstances that defendant committed the murder for pecuniary gain, *id.* § 15A-2000(e)(6) (2005), and that the murder was especially heinous, atrocious, or cruel, *id.* § 15A-2000(e)(9) (2005). After thoroughly reviewing and considering the transcripts, record on appeal, briefs, and oral arguments of counsel, we conclude that the jury's finding of these two aggravating circumstances was supported by the evidence.

Defendant contends in a specific assignment of error that he is entitled to have his death sentence vacated because it was imposed under the influence of passion, prejudice, and other arbitrary factors. However, this argument restates four issues discussed above, relating to the (f)(1) and (f)(7) mitigating circumstances, the newspaper found in the jury room, the prosecutors' closing arguments related to the (e)(9) aggravating circumstance, and the balancing of aggravating and mitigating circumstances. We found no error as to these issues individually and we find no error considering them cumulatively. This assignment of error is overruled. In addition, nothing else in the record suggests the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we must determine whether the death sentence was excessive or disproportionate by comparing the present case with other cases in which we have found the death sentence to be disproportionate. *State v. Smith*, 359 N.C. 199, 223, 607 S.E.2d 607, 624 (citing *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994)), *cert. denied*, —— U.S. ——, 163 L. Ed. 2d 121 (2005). This Court has found the death sentence disproportionate on eight occasions. *State v. Kemmerlin*,

356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997) *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that defendant's case is not substantially similar to any of these.

Several factors support the determination that the imposition of the death penalty here was neither excessive nor disproportionate. The evidence indicated that defendant began planning to kill the victim as soon as their telephone conversation ended the day before the murder; that defendant urged the victim to walk into the field for the ostensible purpose of setting up targets, then shot him without provocation; that the victim asked defendant not to shoot him again; that defendant fired three spaced shots into the victim; that the third shot was fired into the victim's head as the victim lay helpless, watching defendant; that defendant took the victim's keys from his body after shooting him and drove his Thunderbird to West Virginia; that defendant traded or sold the victim's two guns; and that defendant acknowledged that he felt no remorse. We have also held that the (e)(9) aggravating circumstance "is sufficient, standing alone, to affirm a death sentence." *State v. Morgan*, 359 N.C. 131, 174, 604 S.E.2d 886, 912 (2004), *cert. denied*, —— U.S. ——, 163 L. Ed. 2d 79 (2005).

In addition, the jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation, indicating "a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *judgment vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Moreover, defendant was also convicted on the basis of felony murder. We have held that " 'a finding of first-degree murder based on theories of premeditation and deliberation and of felony murder is significant.' " *Smith*, 359 N.C. at 223, 607 S.E.2d at 624 (quoting *State v. Bone*, 354 N.C. 1, 22, 550 S.E.2d 482, 495 (2001), *cert. denied*, 535 U.S. 940, 152 L. Ed. 2d 231 (2002)).

During our proportionality review, "[w]e also consider cases in which this Court has found the death penalty to be proportionate." *State v. al-Bayyinah*, 359 N.C. 741, 762, 616 S.E.2d 500, 515 (2005).

After a complete and careful review of the record, we conclude this case "is more analogous to cases in which we have found the sentence of death proportionate than to those cases in which we have found the sentence disproportionate or to those cases in which juries have consistently returned recommendations of life imprisonment." *Id.*

Based upon the foregoing, we conclude that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.