UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 05-13

---

DAVID CLAYTON LYNCH,

Petitioner - Appellant,

versus

MARVIN POLK, Warden, Central Prison, Raleigh,
North Carolina,

Respondent - Appellee.

---

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte. Richard L. Voorhees,
District Judge. (CA-02-365-3-V)

---

Argued: September 18, 2006          Decided: November 2, 2006

---

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Michael wrote the opinion,
in which Judge Niemeyer and Judge Motz joined.

---

**ARGUED:** Matt C. Stiegler, ACLU CAPITAL PUNISHMENT PROJECT, Durham,
North Carolina, for Appellant. Valerie Blanche Spalding, NORTH
CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for
Appellee. **ON BRIEF:** Mark Melrose, MELROSE, SEAGO & LAY, P.C.,
Sylva, North Carolina, for Appellant. Roy Cooper, Attorney General
of North Carolina, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

MICHAEL, Circuit Judge:

David Lynch was convicted in North Carolina of two counts of first-degree murder, five counts of assault with a deadly weapon upon a law enforcement officer, three counts of assault with a deadly weapon with intent to kill inflicting serious injury, six counts of discharging a firearm into occupied property, two counts of injury to real property, and seven counts of injury to personal property. He was sentenced to death for each murder conviction and to seventy-eight and one-half years' imprisonment for the other convictions. Lynch has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that his Fifth and Sixth Amendment rights were violated (1) when the prosecutor made inflammatory comments during closing argument in the guilt phase of his trial and (2) when the jury foreperson read from the Bible during the penalty phase. The district court denied his petition, and we affirm. The state courts did not make an unreasonable determination of either claim. See 28 U.S.C. § 2254(d). Moreover, we have concluded independently that the prosecutor's improper comments at closing did not render Lynch's trial fundamentally unfair.

I.

David Lynch was arrested after he killed two persons and wounded several others in an extended shooting spree in Gaston County, North Carolina. He confessed to his crimes, including the two murders. The following facts are not in dispute. On December 9, 1991, Lynch got out his .223-caliber rifle, .308-caliber rifle, .45-caliber automatic pistol, and 1,250 rounds of ammunition and placed them next to his bedroom window. He lined his bedroom walls with mattresses, pushed the refrigerator against the front door, and wedged the kitchen stove and washing machine against the back door. He then "nailed all the windows shut that [he] knew [he] would not be shooting from." Trial Transcript (T.T.), May 13, 1993, at 726 (Lynch's statement to the police). After completing these fortifications, Lynch returned to the bedroom, sat down in the middle of the floor, and "waited for [his neighbors] the Andersons to come out." Id.

At 8:00 a.m. Tammy Anderson left her house with her twelve-year-old daughter, India, and Heather Shumate, the daughter of a friend. Lynch attempted to open fire, but his rifle jammed. By the time he reloaded, Mrs. Anderson and the two girls had entered the family car. Lynch decided to shoot at the car, hoping the occupants would "get out and see what happened." Id. His

4

scheme worked, and he opened fire on the three as they left the car.  Lynch said,

> I shot Mrs. Anderson first, and then I shot [India].  I don't know how many times I shot them; but after I shot the mother a couple of times, the daughter started running to the house.  So I shot the mother a couple more times, and then I shot the daughter at least two or three times.

Id.  A neighbor, Ronald Hunter Sr., heard the shooting and rushed outside to try to help the victims.  Lynch immediately shot Hunter in the back and then continued to shoot him after he fell to the ground.  Mrs. Anderson and Heather fled back into the Anderson house, where Mrs. Anderson called 911.  While Mrs. Anderson was on the telephone, Lynch fired into the house, killing Bobby Anderson, the father.  Meanwhile, the wounded Mr. Hunter made it out into the street where India lay and attempted to pull her to safety.  Lynch fired at the two, hitting them both.  Mr. Hunter collapsed, losing consciousness.  India's wounds were fatal.

Police officers soon arrived at the scene, and Lynch began firing on them, injuring several.  A police crisis negotiator, Sergeant James Edwards, was called in to talk with Lynch.  Edwards reached Lynch by telephone, and Lynch said he was suffering from mental problems.  Lynch also explained that he wanted to kill the Andersons because they played loud music and had parties.  After two and one-half hours, Lynch surrendered.  At the

5

station Lynch told police that he was very depressed and had recently driven to Seattle to commit suicide. He then decided that instead of killing himself, he would kill the people who had been bothering him. Lynch admitted that he knew what he had done was wrong, but said "they needed to die." J.A. 645.

Lynch asserted the defense of insanity at trial. Two defense experts (a psychologist and a psychiatrist) testified that Lynch suffered from mental diseases, including major depression and schizotypal personality disorder, which caused him to lose touch with reality. Both experts offered the opinion that Lynch could not understand the nature and quality of his acts on the day of the murders. The prosecution responded with an expert psychiatrist who testified that he did not detect any evidence of psychosis during his examination of Lynch. This expert did not opine on Lynch's mental state on the day of the shootings. The prosecution also presented the testimony of several of Lynch's coworkers and friends, who all testified that Lynch did not appear to be insane during the weeks leading up to the shooting.

The jury determined that Lynch was not legally insane at the time of the murders and found him guilty of two counts of first-degree murder and twenty-one counts charging lesser offenses. The jury recommended the death penalty for each murder, and the trial court sentenced Lynch to death.

Lynch's convictions and sentences were affirmed on direct appeal to the North Carolina Supreme Court, and the U.S. Supreme Court denied his petition for a writ of certiorari. Next, Lynch's (post-conviction) motion for appropriate relief (MAR) was denied by the North Carolina trial court, and the State Supreme Court denied review of the MAR claims. Lynch's application for federal habeas relief was likewise denied by the U.S. district court, and two of his claims are now before us pursuant to certificates of appealability.

II.

Lynch first contends that the prosecutor's prejudicial remarks during closing argument rendered his trial fundamentally unfair, in violation of his Fifth Amendment rights. Second, he contends that the foreperson's reading of a biblical passage during the jury's sentencing deliberations violated his Sixth Amendment rights.

The North Carolina courts decided these claims on the merits, and under the Anti-Terrorism and Effective Death Penalty Act we review these decisions under a "highly deferential standard." Woodford v. Viscotti, 537 U.S. 19, 24 (2002). Accordingly, a writ of habeas corpus cannot be granted unless the state court decisions "w[ere] contrary to, or involved an

7

unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "w[ere] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "[W]e presume the [state] court's factual findings to be sound unless [the petitioner] rebuts the 'presumption of correctness by clear and convincing evidence.'" Miller-El v. Dretke, 545 U.S. ___, 125 S.Ct. 2317, 2325 (2005) (quoting 28 U.S.C. § 2254(e)(1)). If legal or factual error of the degree specified in § 2254(d)(1) or (d)(2) occurred, then a federal court has the obligation to conduct an independent review of the petitioner's claims to determine whether the issuance of a writ is warranted. Rose v. Lee, 252 F.3d 676, 690 (4th Cir. 2001).

## III.

Lynch argues that the prosecutor's inflammatory and prejudicial remarks during closing argument rendered his trial fundamentally unfair, in violation of the Fifth Amendment. In rebuttal argument the prosecutor said that if the jury found Lynch not guilty by reason of insanity, there would be "no restrictions" upon him. Lynch claims that the jury was never instructed to disregard the statement, even though it was contrary to North Carolina law. (If the jury had found Lynch to be insane, he would

8

have been committed immediately to a mental health institution, and he could have been released only by proving in court that he was no longer mentally ill or a danger to others.  See N.C.G.S. §§ 15A-1321, 122C-277(b1), 122C-268.1(i).)  According to Lynch, the prosecutor's "no restrictions" statement created a misguided fear on the part of the jury that led it to disregard compelling evidence of his insanity.

The North Carolina Supreme Court rejected Lynch's unfair trial claim, reasoning as follows:

> We conclude that in this case the trial court properly controlled the prosecutor's closing argument so as to avoid any prejudicial error to the defendant. During the prosecutor's closing arguments the trial court intervened ex mero motu and specifically instructed the jury not to take the prosecutor's personal opinions into consideration. The jurors were also instructed to disregard statements by the prosecutor that defendant would be under no restrictions if found not guilty . . . . Based on our careful review of the prosecutor's closing argument and the instructions given by the trial court during the closing argument, defendant's assignment of error is overruled.

State v. Lynch, 459 S.E.2d 679, 692 (N.C. 1995).

A.

According to Lynch, the North Carolina Supreme Court's decision was based on the court's unreasonable factual determination that Lynch's "jurors were . . . instructed to disregard statements by the prosecutor that [Lynch] would be under

9

no restrictions if found not guilty" by reason of insanity.  Id.

Lynch says that the following excerpt from the closing argument

transcript reveals the state court's error:

> [PROSECUTOR]:  Ladies and gentlemen, the last point I am going to make.  Think about this.  Are you satisfied that he was insane on December 9, 1991. [sic]  The state submits to you that you are not.  If you are even thinking about it, remember this.  Not guilty by reason of insanity is not guilty.  Oh, it has a little bit more wording there but the effect is not guilty.  When you say not guilty you are saying that no crime was committed.  You are saying David Lynch —

> [DEFENSE COUNSEL]:  (Interrupting) - OBJECTION to that argument

> THE COURT:  OVERRULED

> [PROSECUTOR]:  You are saying David Lynch didn't kill and assault.  Are you satisfied?  When you say not guilty that means there are no restrictions on Mr. Lynch.

> [DEFENSE COUNSEL]:  OBJECTION

> THE COURT:  SUSTAINED.  Well, OVERRULED as to that statement.

> [PROSECUTOR]:  No restrictions.  Perhaps some day he becomes your neighbor.

> [DEFENSE COUNSEL]:  (Interrupting) - OBJECTION

> THE COURT:  SUSTAINED.  Stay within the bounds of argument.

> [DEFENSE COUNSEL]:  Ask the Court to instruct the jury to disregard the last statement.

> THE COURT:  ALLOWED.  Members of the jury, do not take the last statement of the district attorney in consideration in your jury deliberations.

10

Closing Argument Transcript at 237-38.

Lynch argues that in light of the trial court's initial approval of the "no restrictions" statement, the court's instruction to the jury moments later to disregard "the last statement" referred only to the "your neighbor" sentence. It did not, he says, refer to the "No restrictions" sentence. This reading is a plausible one, but it is not the only reasonable reading. The word "statement" commonly refers to more than one sentence. Thus, it was not unreasonable for the North Carolina Supreme Court to find that when the trial court used the term "last statement," it was instructing the jury to disregard all of what the prosecutor had just said, specifically, "No restrictions. Perhaps some day he becomes your neighbor."

In any event, a final curative instruction made it reasonable for the North Carolina Supreme Court to find that the trial court instructed the jury to disregard the prosecutor's "no restrictions" argument. Defense counsel made his request for this instruction as follows:

> [DEFENSE COUNSEL]: I am requesting that you instruct the jury that if they return verdicts of not guilty by reason of insanity that "The defendant shall immediately be committed to the state mental facility; any further proceedings would be a matter for the Court and should not concern you." . . . We are simply requesting that [instruction] because of the comments of the state district attorney during the final argument that words to the effect of -- "If you find him not

11

> guilty by reason of insanity <u>there would be no restrictions on the defendant</u>," which we OBJECTED to and made a motion for a mistrial. Of course, the objection was overruled and the motion for mistrial was denied. We feel that this is sufficient to tell the jury a correct statement of the law . . . to counter that statement by the state that he would be unrestricted.

T.T., May 17, 1993, at 534 (emphasis added). The trial court gave the curative instruction exactly as requested by Lynch's counsel, who considered the instruction to be sufficient to counter the prosecutor's "no restrictions" remark. The State Supreme Court therefore did not err in finding that the jury was "instructed to disregard statements by the prosecutor that [Lynch] would be under no restrictions if found not guilty [by reason of insanity]." <u>Lynch</u>, 459 S.E.2d at 692. Accordingly, the state court's decision that the prosecutor's closing argument did not render Lynch's trial to be unfair was not based on an unreasonable determination of the relevant facts.

The district court's denial of habeas relief to Lynch on his unfair trial claim can be affirmed because he has failed to demonstrate that the North Carolina Supreme Court's decision was based on an unreasonable determination of fact.

12

B.

In the alternative, our independent review of the Fifth Amendment claim reveals that the prosecutor's "no restrictions" comments did not render Lynch's trial fundamentally unfair.

In analyzing "a due process claim premised on unfair prosecutorial conduct," we examine several factors, including "the nature of the prosecutorial misconduct, the extent of the improper conduct, the issuance of curative instructions from the court, any defense conduct inviting the improper prosecutorial response, and the weight of the evidence." Humphries v. Ozmint, 397 F.3d 206, 218 (4th Cir. 2005) (en banc) (internal citations omitted); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986) (stating that the relevant question is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'"). These factors are examined in the context of the entire trial, and no one factor is dispositive. Donnelly v. DeChristoforo, 416 U.S. 637, 639 (1974).

1.

The conduct challenged here is the prosecutor's statements in rebuttal argument that Lynch would be released with "no restrictions" if he was found not guilty by reason of insanity. The argument was improper because it was not true and appeared calculated to frighten the jury into believing that an insanity

13

verdict would free Lynch, putting him in a position to attack and kill his next set of neighbors.  Unless countered by an appropriate instruction, this fear could influence a juror to overlook evidence of insanity and vote for a conviction.

2.

The two improper "no restrictions" comments were isolated, but they came at the end of the prosecutor's rebuttal argument.  They were among the last comments the jurors heard from the prosecutor.

3.

The trial court issued curative instructions, during closing argument itself and later in a supplemental charge.  The prosecutor made the "no restrictions" comments in quick succession.  After the second time, when the prosecutor said, "No restrictions.  Perhaps some day he becomes your neighbor," the court instructed the jury to disregard the "last statement."  Regardless of whether that instruction was clear enough, the court, <u>at Lynch's request</u>, gave the jury the following additional instruction immediately before it retired to deliberate:

> Now, members of the jury, I instruct you in addition to the instruction that I gave to you yesterday as follows.  That if you return verdicts of not guilty by reason of insanity, the defendant shall immediately be committed to a state mental institution or facility.  Any further proceedings would be a matter for the Court and should not concern you.

T.T., May 17, 1993, at 539. Defense counsel said at the time that this instruction would be "sufficient to tell the jury a correct statement of the law . . . to counter the statement by the state that [Lynch] would be unrestricted." Id. at 534.

4.

We see nothing in the record to suggest that defense counsel's conduct invited the prosecutor to make the improper comments.

5.

The evidence of Lynch's guilt was overwhelming. He confessed to the murders. Moreover, the substantial evidence that Lynch understood the nature and quality of his actions on the day of the murders reduces the likelihood that the prosecutor's "no restrictions" comments induced the jury to disregard evidence of Lynch's insanity. Dr. Clabe Lynn, the State's expert witness, testified that Lynch was depressed but that he did not show any "signs or symptoms of psychosis or schizophrenia." J.A. 452. An employer testified that Lynch acted normally at work, and a coworker testified that he did not seem "mentally ill at all." J.A. 513. Police negotiator Sergeant Edwards testified that Lynch spoke calmly, deliberately, and rationally throughout his three and one-half hour negotiations with the police. The evidence also established that Lynch carefully and deliberately planned the

15

murders.  Finally, in his confession Lynch recounted in meticulous detail the events on the day of the murder.  His words suggest that he was lucid.  Nothing in the confession indicates that he was mentally impaired or that he could not tell the difference between right and wrong.  In fact, Lynch stated that he knew what he did was wrong, but that his neighbors "needed to die."  J.A. 831.

After considering all of these factors, we conclude that the prosecutor's improper comments during closing argument did not deprive Lynch of a fair trial.  The curative instructions sufficiently clarified the consequences of a not guilty by reason of insanity verdict, and there was substantial evidence that Lynch was sane when he committed the murders.  Lynch's Fifth Amendment claim is without merit.

IV.

Lynch's second argument is that his Sixth Amendment rights were violated when the jury foreperson recited a Bible verse during sentencing deliberations.  Lynch asserts that habeas relief is warranted because the state court's adjudication of this claim was contrary to federal law.

The facts underlying this claim are not contested.  Jury foreperson Ronald Walker took his own copy of the Bible to the sentencing deliberations.  During those deliberations the jury

16

determined that Lynch was eligible for the death penalty. The jury then took a further vote on its recommended sentence, and eleven jurors voted for death. Next, Walker led the jury in prayer. In addition, he told his fellow jurors that he believed in the death penalty because of Genesis, Chapter 9, verse 6, which he read aloud: "Whoever sheddeth a man's blood by man his blood must be shed." J.A. 815. The undecided juror, Nellie Fox, said that she understood the passage, but that she did not believe the Old Testament was relevant today. Shortly thereafter, the jury took another vote, and the vote for the death penalty was unanimous. Fox later testified that the foreperson's biblical reading did not influence her decision to vote for death. The state MAR court determined that Lynch "presented nothing at the evidentiary hearing which satisfactorily demonstrates that juror Fox changed her vote from life to death as a result of foreman Walker's reading of Genesis 9:6." J.A. 818. As a result, the court denied Lynch's motion for appropriate relief.

Lynch argues that the MAR court's adjudication of this claim was an unreasonable application of Supreme Court precedent because the fact that the Bible reading did not cause Fox to change her vote is not a valid basis for rejecting his claim. The Bible reading, Lynch argues, was an extraneous influence on the jury that is presumptively prejudicial. See Remmer v. United States, 347

17

U.S. 227, 229 (1954).  In habeas review, however, we look at the "result that the state court reached, not 'whether [its decision] [was] well reasoned.'"  Robinson v. Polk, 438 F.3d 350, 358 (4th Cir. 2006) (quoting Wilson v. Ozmint, 352 F.3d 847, 855 (4th Cir. 2003)).  Our task is to determine whether the result reached by the state MAR court was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Longstanding considerations, particularly the critical need for "frankness and freedom of discussion and conference" among jurors, McDonald v. Pless, 238 U.S. 264, 268 (1917), "support the protection of jury deliberations from intrusive inquiry" by courts, Tanner v. United States, 483 U.S. 107, 127 (1987).  Thus, the Sixth Amendment does not require judicial examination of all alleged prejudicial influences on a jury.  Indeed, the general rule is that juror testimony may not be used to impeach a jury verdict.  See id. at 117.  The Supreme Court, however, has carved out a limited exception to this rule for the situation where it is alleged that an external influence affected jury deliberations.  Parker v. Gladden, 385 U.S. 363, 364-66 (1966).  This exception with respect to external influences is aimed at ensuring an impartial jury that takes the evidence it considers "only from the witness stand in a public courtroom."  Id. at 364.

18

A distinction is thus made between external and internal influences on jury deliberations. See Robinson, 438 F.3d at 361-62. The Supreme Court has not provided a precise test for distinguishing between the two, nor has it determined which category a Bible reading fits into. See id. at 363. The Court, however, has provided some guidance. In determining whether an influence is external or internal, a court should look to the "nature of the [influence]," not to whether it "took place inside or outside the jury room." Tanner, 483 U.S. at 117. For example, a radio newscast in the jury room about the case at issue is properly considered an external influence. Id. at 123. On the other hand, statements made by jurors during deliberations are internal influences. Id. at 125.

The result in this case is dictated by our decision in Robinson. There, we held that the state court had not unreasonably applied Supreme Court precedent, described above, in determining that a Bible reading during jury deliberations was an internal influence that was not subject to judicial inquiry. We reasoned that "reading the Bible [during sentencing deliberations] is analogous to a situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence." Robinson, 438 F.3d at 365. We also concluded that it was reasonable to determine that the biblical passage did not

19

constitute evidence against the defendant.  Id. at 363.  As a result, we held that the petitioner was not entitled to habeas relief on his claim that he was denied his Sixth Amendment rights.  Id. at 366.  Lynch's Sixth Amendment claim based on the foreperson's Bible reading fails because Lynch's case is indistinguishable from Robinson.  Robinson, in other words, confirms that the result reached by the state MAR court on Lynch's Sixth Amendment claim was not contrary to clearly established federal law, as determined by the Supreme Court.

V.

For the foregoing reasons, the judgment of the district court denying David Lynch's petition for a writ of habeas corpus is affirmed.

AFFIRMED