**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-6**

---

JASON WAYNE HURST,

       Petitioner - Appellant,

    v.

CARLTON B. JOYNER, Warden, Central Prison, Raleigh, North Carolina,

       Respondent - Appellee.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Thomas D. Schroeder, District Judge. (1:10-cv-00725-TDS-LPA)

---

Argued: January 29, 2014          Decided: July 2, 2014

---

Before TRAXLER, Chief Judge, and NIEMEYER and SHEDD, Circuit Judges.

---

Reversed and remanded by published opinion.  Chief Judge Traxler wrote the opinion, in which Judge Niemeyer and Judge Shedd joined.  Judge Shedd wrote a separate concurring opinion, in which Judge Niemeyer joined.

---

**ARGUED**: Robert Hood Hale, Jr., ROBERT H. HALE, JR. & ASSOCIATES, Raleigh, North Carolina, for Appellant.  Mary Carla Hollis, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.  **ON BRIEF**: Roy Cooper, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

TRAXLER, Chief Judge:

Petitioner Jason Wayne Hurst, a North Carolina death row inmate, appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254, alleging that his Sixth Amendment rights to an impartial jury and to be confronted with the witnesses against him were violated by an extraneous communication between a juror and her father during the penalty phase of his capital murder trial. For the following reasons, we reverse the district court's judgment and remand for an evidentiary hearing to determine whether the extraneous communication had a substantial and injurious effect or influence on the jury's verdict.

I.

A.

The facts underlying this capital murder are well documented in the state court decision affirming Hurst's conviction and sentence on direct appeal. See State v. Hurst, 624 S.E.2d 309 (N.C. 2006).

On June 9, 2002, Daniel Branch told his wife that he was going to Asheboro, North Carolina, to trade guns with Hurst, with whom he was acquainted. Branch loaded several guns in his vehicle and left home in the late morning. When he failed to return, Branch's wife contacted authorities. During the investigation, North Carolina authorities were advised that

2

Hurst had been seen in West Virginia driving a vehicle that matched the information they had regarding Branch's vehicle. Hurst was located and apprehended, and he confessed to killing Branch with a shotgun and stealing his car. Branch's body was found in the field where Hurst murdered him.

Hurst was convicted by the jury of first-degree murder and, following the penalty phase, sentenced to death. The North Carolina Supreme Court affirmed, see id., and the United States Supreme Court denied certiorari review, see Hurst v. North Carolina, 549 U.S. 875 (2006).

On June 25, 2007, Hurst filed a Motion for Appropriate Relief ("MAR") in state court seeking, among other things, postconviction relief from his death sentence based upon an alleged violation of his Sixth Amendment right to have an impartial jury and to confront his accusers during the penalty phase of his trial. Hurst based his claim on an affidavit of Juror Christina Foster, which had been provided to Hurst's postconviction investigator, Adam Pfeifer, on April 21, 2007. Pertinent to the issue before us, Juror Foster stated as follows:

> 7. During the trial, the jurors prayed together. We did this throughout the time from when we were selected. The prayer was led by either the foreman or another older male juror. We prayed for our families and for what we had to go through.
>
> . . . .

3

9. During the trial, I often had lunch with my father who worked near the courthouse. Prior to deliberations, I asked my father where I could look in the Bible for help and guidance in making my decision for between life and death. After the jury had found Mr. Hurst guilty but before we decided his sentence, I opened my Bible at home because I wanted to read something to help me with my decision. My father had given me the section in the Bible where I could find "an eye for an eye." That night after reading that section in the Bible, it helped me sleep better. It didn't make the decision any easier. The next day during deliberations, I voted for the death penalty.

J.A. 441. Hurst argued that when Juror Foster's father gave her the "eye for an eye" citation, he implied that her decision should be death, entitling Hurst to a new capital sentencing hearing. In the alternative, Hurst requested an evidentiary hearing to resolve any factual disputes pertaining to the extraneous communication.

On August 2, 2007, the state filed a response to the MAR, as well as a motion to dismiss. The state argued: (1) that the "eye for an eye" passage given to Juror Foster by her father did not constitute extraneous, prejudicial information sufficient to impeach the jury's verdict; (2) that the father's mere act of providing the passage to his daughter at her request likewise did not rise to the level of an extraneous prejudicial contact or communication about the case; and (3) that Hurst had otherwise failed to present any evidence that Juror Foster's father knew what case she was sitting on or that he deliberately attempted to influence her vote.

4

The state court scheduled a hearing for October 19, 2007, to rule upon the state's motion to dismiss. On the morning of the hearing, Hurst filed a motion seeking leave to depose Juror Foster, Juror Foster's father, and Juror Foster's grandmother. In support of the motion, Hurst presented an affidavit from Investigator Pfeifer, dated October 18, 2007. In the affidavit, Investigator Pfeifer confirmed that he interviewed Juror Foster on April 21, 2007, at which time "she agreed to provide [him] with [the] affidavit which tracked [their] discussion." J.A. 457. Investigator Pfeifer also stated that he had interviewed Juror Foster's father on October 9, 2007, who "confirmed that he had a conversation with his daughter about an 'eye for an eye' section of the Bible during his daughter's deliberations in the Hurst trial," and added that he had obtained the Biblical citation from his mother in South Carolina. J.A. 458. Investigator Pfeiffer's efforts to interview Juror Foster's grandmother, however, had been unsuccessful, and Hurst had been unable to determine exactly which "eye for an eye" verse Juror Foster's father had provided to his daughter.[1] Based upon

_____

[1] As we have previously noted, the King James Version of the Bible contains several "eye for an eye" verses.

> The Old Testament contains three such passages: (1) "Eye for eye, tooth for tooth, hand for hand, foot for foot," Exodus 21:24; (2) "Breach for breach, eye for eye, tooth for tooth: as he hath caused a blemish in a
(Continued)

5

Investigator Pfeiffer's affidavit, Hurst argued that depositions or an evidentiary hearing were in order to "significantly assist in the search for truth about Juror Foster's extrajudicial conversations with her father."  J.A. 454.

On February 4, 2008, the state court made the following relevant findings and conclusions:

> The Fourth Circuit Court of Appeals has determined that the Bible does not constitute an improper external influence in a capital case, whether read aloud by one juror to the others during sentencing deliberations, whether read by a juror in the privacy of his home, or whether read to herself by a juror during deliberations [citing our holdings in Robinson v. Polk, 438 F.3d 350 (4th Cir. 2006); Lynch v. Polk, 204 Fed. Appx. 167 (4th Cir. 2006) (unpublished); Billings v. Polk, 441 F.3d 238 (4th Cir. 2006); and Lenz v. Washington, 444 F.3d 295 (4th Cir. 2006)].
>
> Moreover, defendant presented no evidence that juror Foster's father knew what case juror Foster was sitting on, and no evidence that he deliberately attempted to influence her vote by directing her to a specific passage in the Bible.  Instead, defendant

---

man, so shall it be done to him again," Leviticus 24:20; (3) "And thine eye shall not pity; but life shall go for life, eye for eye, tooth for tooth, hand for hand, foot for foot," Deuteronomy 19:21.

Robinson v. Polk, 438 F.3d 350, 358-59 n.8 (4th Cir. 2006). However, "in the New Testament Sermon on the Mount, Jesus said, 'Ye have heard that it hath been said, An eye for an eye, and a tooth for a tooth: But I say unto you, that ye resist not evil: but whosoever shall smite thee on thy right cheek, turn to him the other also.' Matthew 5:38-39." Id.

presented a motion for depositions of juror Foster, her father, and her grandmother.

J.A. 481-82. The state court denied Hurst's claim on the merits and denied his motion for discovery.

B.

On September 20, 2010, Hurst filed a petition for federal habeas relief under 28 U.S.C. § 2254, again raising his Sixth Amendment juror-influence claim. The state moved for summary judgment. In response, Hurst filed a motion to depose the same three witnesses. On the recommendation of the magistrate judge, the district court denied the motion for depositions, declined Hurst's request for discovery or an evidentiary hearing, and dismissed the habeas petition. The district court concluded as follows:

> The United States Supreme Court has not held that the reading of a Bible verse constitutes "a matter before the jury" or raises a presumption of prejudice as an improper extrinsic influence. In light of the Fourth Circuit cases holding that, in the context of habeas review, a juror's consultation and/or recitation of Bible verses does not trigger a presumption of prejudice (indeed, does not even constitute an extrinsic influence), it cannot be said that the state MAR court's determination -- that the father's reference to an "eye for an eye" Biblical passage in this case did not give rise to a presumption of prejudice under Remmer -- was an unreasonable application of, or contrary to, federal law as determined by the United States Supreme Court. Accordingly, [the] [c]laim . . . fails.

J.A. 361 (emphasis in original) (citing Remmer v. United States, 347 U.S. 227 (1954)). However, the district court granted a

7

certificate of appealability with respect to the issue of whether Juror Foster's extraneous contact with her father violated Hurst's Sixth Amendment rights. For the following reasons, we reverse the judgment of the district court and remand for an evidentiary hearing.

## II.

### A.

Under 28 U.S.C. § 2254(d), as revised by AEDPA, a federal court may grant habeas relief to a state prisoner only if the state court's adjudication of the merits of the constitutional claim at issue was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). A state court's decision is "contrary to" clearly established Supreme Court precedent only if it is "substantially different" from that precedent. Williams (Terry) v. Taylor, 529 U.S. 362, 405 (2000). The decision is "an unreasonable application of" clearly established Supreme Court precedent only if it is "objectively unreasonable." Id. at 409.

As the United States Supreme Court has increasingly cautioned, AEDPA significantly constrains our review of state

8

court decisions on federal constitutional claims. We are not at liberty to substitute our judgment for that of the state court on matters of federal constitutional law, even if we believe the state court decision was incorrect. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (emphasis added); see also Harrington v. Richter, 131 S. Ct. 770, 785 (2011). The state court decision may be deemed unreasonable "only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents.'" Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013) (per curiam) (quoting Harrington, 131 S. Ct. at 786).

B.

The Sixth and Fourteenth Amendments to the United States Constitution "guarantee[] to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). They also protect "[t]he right of confrontation" which "requires that the 'jury's verdict must be based upon the evidence developed at the trial.'" Robinson v. Polk, 438 F.3d 350, 359 (4th Cir. 2006) (quoting Turner v. Louisiana, 379 U.S. 466, 472 (1965)). At its core, these Sixth

9

Amendment rights are designed to ensure "'that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right[s].'" Id. (quoting Turner, 379 U.S. at 472) (alteration in original).

The privacy and protection concerns that inevitably arise when one seeks to impeach a jury's verdict, however, are also well established. "Despite the[] venerable protections afforded to criminal defendants, the Sixth Amendment does not require that all evidence introduced by the defendant tending to impeach the jury's verdict be considered by the courts." Id. "In fact, the common-law rule generally 'prohibited the admission of juror testimony to impeach a jury verdict.'" Id. (quoting Tanner v. United States, 483 U.S. 107, 117 (1987)). This common-law rule, now codified in Federal Rule of Evidence 606(b), prohibits juror testimony to impeach the verdict, subject to three exceptions, two of which are relevant here: "A juror may testify about whether . . . extraneous prejudicial information was improperly brought to the jury's attention" or whether "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2)(A)&(2)(B);[2] see also Mattox v. United States, 146

---

[2] A juror may also testify concerning whether "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2)(C).

10

U.S. 140, 149 (1892) ("[T]he evidence of jurors, as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict. But a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind.").

In Mattox, the Supreme Court applied this common-law exception and remanded for a new trial where a convicted defendant unsuccessfully attempted to introduce affidavits to the trial court setting forth prejudicial, extraneous statements made by a bailiff to the jury about the defendant, as well as a damaging newspaper article about the case that had been read to the jury. See id. at 143-44. The Supreme Court held that such "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." Id. at 150.

Thereafter, in Remmer v. United States, 347 U.S. 227 (1954), the Supreme Court considered an alleged bribery attempt of a juror during trial, and the FBI's investigation of the attempt, all of which was handled by the district court in an ex parte proceeding prior to the verdict being delivered. After learning of the incident through post-trial press accounts, the defendant moved for a new trial and requested "a hearing to

11

determine the circumstances surrounding the incident and its effect on the jury." Id. at 228. Building upon its earlier precedent in Mattox, the Supreme Court held that:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Id. at 229 (emphasis added). Unlike in Mattox, neither the Court nor the defendant knew from the existing record "what actually transpired, or whether the incidents that may have occurred were harmful or harmless." Id. The Court held that "[t]he trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." Id. at 229-30.[3]

_____

[3] Interpreting and applying these Supreme Court cases, this circuit has formulated a burden-shifting approach for analyzing a convicted defendant's allegations that his Sixth Amendment rights were violated by an extraneous communication or contact with a juror during the pendency of a trial. "First, the party attacking the verdict must introduce competent evidence that there was an extrajudicial communication or contact, and that it was "'more than innocuous interventions.'" Howard v. Moore, 131 F.3d 399, 422 (4th Cir. 1997) (en banc) (quoting United States
(Continued)

III.

Presented with evidence of the communication between Juror Foster and her father about the Bible verse, the state court considered whether extraneous prejudicial information or evidence had been brought to Juror Foster's attention (i.e., the Bible verse itself), as well as whether an outside influence was improperly brought to bear upon Juror Foster. In doing so, the state court relied upon several Sixth Amendment "Bible-verse" cases from our circuit, most notably our decision in Robinson.

In Robinson, a North Carolina death row inmate claimed that his Sixth Amendment right to an impartial jury had been violated during the sentencing phase of his trial when one of the jurors asked the bailiff for a Bible, received it, and then read "eye for an eye" passages to the other jurors in an effort to persuade them to "change their position from one favoring a life sentence to one favoring a death sentence." Robinson, 438 F.3d at 358 (internal quotation marks omitted). The state court denied the claim without an evidentiary hearing.

---

v. Cheek, 94 F.3d 136, 141 (4th Cir. 1996)). "If this requirement is satisfied, the Remmer I presumption automatically arises." Id. Once this initial showing is made and the Remmer presumption of prejudice arises, "the burden shifts to the prevailing party [at trial] to demonstrate that there exists no reasonable possibility that the jury's verdict was influenced by [the] improper communication." Id. (internal quotation marks omitted).

13

After considering Remmer and the related Supreme Court precedents, we concluded that the North Carolina court's decision denying petitioner relief was not an unreasonable application of clearly established federal law. We held that:

> it would have been reasonable for the MAR court to conclude that the Bible had no bearing on any fact relevant to sentencing, and was therefore not tantamount to "evidence" that was used against him at sentencing. . . . In the end, the jury concluded that the balance of the aggravating and mitigating circumstances warranted imposing the death penalty. . . . [N]o Biblical passage - including the ones we assume were read - had any evidentiary relevance to the jury's determination of the existence of these aggravating and mitigating circumstances.

Id. at 363. We additionally held that:

> it would have been reasonable for the MAR court to conclude that the Bible is not analogous to a private communication, contact, or tampering with a juror, [about the matter pending before the jury,] and that the common-law rule against allowing juror testimony applied. See Remmer, 347 U.S. at 229. Unlike these occurrences, which impose pressure upon a juror apart from the juror himself, the reading of Bible passages invites the listener to examine his or her own conscience from within.

Id. (emphasis added). Although a third party, the bailiff, provided the Bible to the juror at the latter's request, we found that distinction unavailing as well:

> The fact that the bailiff provided the Bible to the juror does not alter our conclusion that it was not an external influence. Robinson does not allege that the bailiff instructed the jury to consult the Bible, or, for that matter, that he did anything other than simply provide the Bible upon the juror's request. On these facts, the MAR court reasonably could have concluded that the bailiff's act of providing a Bible

14

was nothing more than an innocuous intervention into the jury's deliberations. . . . The MAR court reasonably could have concluded that the bailiff's actions in fulfilling the juror's request did not, without more, turn the Bible into an external influence.

Id. at 366 (citation omitted).[4]

Both the state MAR court, and the Respondent in this appeal, rely upon our decision in Robinson as support for the determination that Hurst failed to make the requisite showing to benefit from the Remmer presumption of prejudice. As in Robinson, the Respondent argues, the Bible verse that Juror Foster's father gave to her did not constitute "extraneous prejudicial information," and his mere act of providing the verse did not rise to the level of an improper, external influence.

Recently, however, in Barnes v. Joyner, 2014 WL 1759085 (4th Cir. 2014), we held that "Remmer clearly established not only a presumption of prejudice, but also a defendant's entitlement to an evidentiary hearing, when the defendant presents a credible allegation of communications or contact

---

[4] As the state MAR court correctly observed, this court has held firm to the view that Bible-verse readings, whether occurring privately or in the jury room, do not alone constitute extraneous prejudicial information or an outside influence improperly brought to bear upon the jury. See Lenz v. Washington, 444 F.3d 295, 300-01 (4th Cir. 2006); Billings v. Polk, 441 F.3d 238, 248-49 (4th Cir. 2006); Lynch v. Polk, 204 Fed. Appx. 167, 175 (4th Cir. 2006); see also Burch v. Corcoran, 273 F.3d 577, 591 (4th Cir. 2001).

between a third party and a juror concerning the matter pending before the jury." Id. at *10; see also id. at *12 ("[I]t is clearly established federal law for purposes of our review under AEDPA that a defendant is entitled to a hearing when he or she presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury."). Once the defendant presents such a "genuine allegation," the "presumption of prejudice must be applied, and . . . a hearing must be held." Id. at *14 (emphasis added).

In Barnes, defense counsel, in closing arguments, suggested to the jury that "if [the] jurors voted for the death penalty, they would one day face God's judgment for killing the[] defendants." Id. at *4. Barnes presented evidence, both to the trial court and the state MAR court, that one of the jurors contacted her pastor during the sentencing deliberations to discuss the defense counsel's argument. Barnes also alleged that during this conversation the pastor directed the juror to a biblical passage that contradicted the passage defense counsel had relied upon. The juror, in turn, shared the passage with her fellow jurors during deliberations. See id. The question, therefore, was whether Barnes had presented a credible allegation that the communication or contact between the juror and her pastor "concerned the matter pending before the jury." Id. at *15.

16

There was no evidence presented that the pastor and the juror discussed the facts of the specific case, or his views about the death penalty, or that he attempted to persuade the juror to vote a particular way. However, we held that the juror's extraneous conversation with her pastor "about defense counsel's argument, which asked the jury to return a sentence of life imprisonment instead of death, bore on the jury's sentencing determination and was, therefore, 'about the matter pending before the jury.'" Id. at *17. We held as follows:

> During the sentencing phase of Barnes' trial, the jury was charged with deciding whether to impose a sentence of life imprisonment or a sentence of death for Barnes and his co-defendants. Clearly, then, "the matter before the jury" was the appropriateness of the death penalty for these defendants. To the extent that a juror had a conversation with a third party about the spiritual or moral implications of making this decision, the communication "was of such a character as to reasonably draw into question the integrity of the verdict," Stockton, 852 F.2d at 743, and further inquiry in a Remmer hearing was required.

Id. at *16. "To conclude otherwise," we held, "would not simply be incorrect or erroneous; it would be objectively unreasonable." Id. at *17. We also distinguished our prior precedent in Robinson, concluding that:

> the only similarity between the instant case and the 'Bible in the jury room' line of cases [was] the Bible itself. Unlike in Robinson, where the juror in question was simply given a Bible and read from it in the jury room, [petitioner] has alleged that [the juror] was actually directed to a specific biblical passage by [the third party.] We alluded that Robinson might have been a different case if the

17

> bailiff had "instructed the jury to consult the Bible" or done "anything other than simply provide the Bible upon the juror's request."

Id. at *19.

Our holding in Barnes dictates the same result in this case. According to the affidavits presented to the state MAR court, Juror Foster asked her father where she "could look in the Bible for help and guidance in making [her] decision for between life and death." J.A. 441. He, in turn, directed her to an (as yet) undetermined "eye for an eye" verse, which she consulted in private the night before returning the verdict.

The affidavits did not allege that Juror Foster discussed with her father the facts or evidence that had been presented in the trial, or the status of the jury's deliberations. Nor was there any evidence that Juror Foster's father expressed any opinion about the case or attempted to influence her vote. Nevertheless, Hurst presented a credible allegation of a private communication about the matter pending before the jury, entitling Hurst to the presumption of prejudice and an evidentiary hearing. Accordingly, we hold, as we did in Barnes, that the state court's failure to apply the Remmer presumption and to conduct an evidentiary hearing in light of this showing

18

was contrary to or an unreasonable application of the Supreme Court precedents applicable to juror-influence claims.[5]

IV.

Our conclusion that the state court unreasonably applied Supreme Court precedent, however, does not end our inquiry. Hurst is not entitled to federal habeas relief unless we are also convinced that the communication between Juror Foster and her father "had a 'substantial and injurious effect or influence in determining the jury's verdict.'" Fullwood v. Lee, 290 F.3d 663, 679 (4th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); see also Hall v. Zenk, 692 F.3d 793, 805 (7th Cir. 2012) (noting that the petitioner's "initial victory is more theoretical that practical, since he still must establish that he was prejudiced by the state courts' constitutional error").

On the present record, Hurst cannot meet this burden. Therefore, he has requested an opportunity to now develop his claim in an evidentiary hearing before the district court. As was the case in Barnes, Hurst contends that the state court's failure to investigate Juror Foster's communication with her

---

[5] In accordance with our decision in Robinson, the state court reasonably determined that the mere existence of the Bible verse in the hands of Juror Foster and her consideration of it was not extraneous prejudicial information that violated his Sixth Amendment rights.

father gave the district court "no basis from which to determine whether [the communication] was harmless." Barnes, 2014 WL 1759085, at *19. The State, on the other hand, argues that 28 U.S.C. § 2254(e)(2) prohibits us from granting him that opportunity in this case because, even if Hurst has met the § 2254(d) requisites, his failure to exercise proper diligence in developing his claim in state court deprives him of the right to do so now. We disagree.

Section 2254(e)(2) "imposes a limitation on the discretion of federal habeas courts to take new evidence in an evidentiary hearing." Cullen v. Pinholster, 131 S. Ct. 1388, 1400-01 (2011). "A district court may not grant an evidentiary hearing to a habeas petitioner if the petitioner 'failed to develop the factual basis of a claim,'" in state court, 28 U.S.C. § 2254(e)(2), due to "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams (Michael) v. Taylor, 529 U.S. 420, 432 (2000). "Like § 2254(d)(1), [§ 2254(e)(2)] carries out AEDPA's goal of promoting comity, finality, and federalism by giving state courts the first opportunity to review a claim, and to correct any constitutional violation in the first instance." Cullen, 131 S. Ct. at 1401 (internal quotation marks and alteration omitted). Moreover, "[s]ection 2254(e)(2) continues to have force [even] where § 2254(d)(1) does not bar federal habeas relief." Id. It

20

"still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court," and "ensure[s] that federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." Id. (internal quotation marks and alteration omitted).

"[T]he requirements that petitioners exhaust their state remedies and diligently develop the record in state court are exacting burdens," and "new evidence submitted in federal court that fundamentally alters a claim presented in state court will render that claim unexhausted." Winston v. Pearson, 683 F.3d 489, 497 (4th Cir. 2012) (internal quotation marks omitted). Moreover, "that a petitioner requested an evidentiary hearing from the state court, without more, might not always suffice to satisfy AEDPA's diligence requirement." Id.

In this case, however, Hurst did not merely seek to engage in a fishing expedition to uncover evidence of juror misconduct that he could and should have investigated and presented to the state MAR court in the first instance. Rather, he presented evidentiary affidavits in support of a specific Sixth Amendment claim to the state MAR court, sufficient to entitle him to the Remmer presumption of prejudice and a Remmer evidentiary hearing. He then requested both discovery and an evidentiary

hearing before the state MAR court to explore the private communication between Juror Foster and her father and, more specifically, the question of whether their conversation prejudiced the verdict. Because the state MAR court unreasonably denied Hurst's motion for further evidentiary development, Hurst did not "fail[] to develop the factual basis of [his] claim" under § 2254(e), and we are left with an incomplete and inadequate record for review.

On remand, Hurst will be given the opportunity to develop the record as it pertains to Juror Foster's extraneous conversation with her father, but he will not be entitled to the Remmer presumption in attempting to demonstrate that the communication had a substantial and injurious effect or influence on the jury's verdict. See Barnes, 2014 WL 1759085, at *20. "[T]o be entitled to habeas relief," Hurst "will need to affirmatively prove actual prejudice by demonstrating that the jury's verdict was tainted by the extraneous communication between" Juror Foster and her father. Id.

V.

For the foregoing reasons, the judgment of the district court is reversed and the matter remanded for an evidentiary hearing on the issue of whether the communication between Juror Foster and her father about the Bible verse had a substantial

and injurious effect or influence in determining the jury's verdict.

<u>REVERSED AND REMANDED</u>

SHEDD, Circuit Judge, concurring:

In view of the Supreme Court's recent admonition in White v. Woodall, 134 S.Ct. 1697, 1706 (2014) (emphasis in original), that "[s]ection 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error," I believe the district court correctly determined that the state MAR court did not unreasonably interpret Remmer v. United States, 347 U.S. 227, 229 (1954), in denying Hurst relief. Thus, if we were writing on a clean slate, I would affirm the district court's grant of summary judgment to the state.

However, I agree with Judge Traxler that, given our recent sweeping decision in Barnes v. Joyner, -- F.3d --, 2014 WL 1759085 (4th Cir. 2014), we are constrained to vacate the grant of summary judgment and remand this case for an evidentiary hearing. Although I recognize that Barnes controls the outcome in this case, I note that our opinion in Barnes "acknowledges AEDPA's constraints only in the abstract, while simultaneously analyzing the case at bar as if it were on direct appeal," Barnes, 2014 WL at *21, (Agee, J., dissenting) and in so doing "disregard[ed] perfectly reasonable interpretations [of Supreme Court precedent] and hence contravene[ed] § 2254(d)'s deferential standard of review," White, 134 S.Ct. at 1704.

24

Notwithstanding these reservations, I concur.