# SUPREME COURT OF THE UNITED STATES

CARLTON JOYNER, WARDEN *v.*
WILLIAM LEROY BARNES

CARLTON JOYNER, WARDEN *v.*
JASON WAYNE HURST

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14–395.   Decided June 29, 2015

The motions of respondents for leave to proceed *in forma pauperis* are granted. The petition for a writ of certiorari is denied.

JUSTICE THOMAS, with whom JUSTICE ALITO joins, dissenting from the denial of certiorari.

The U. S. Court of Appeals for the Fourth Circuit made the same error in these cases that we have repeatedly summarily reversed this Term. I see no reason why these cases, which involve capital sentences that the State of North Carolina has a strong interest in imposing, should be treated differently. We should be consistent, and use our discretionary review authority to correct this error.

I

This petition arises from two cases, which involve two separate defendants and trials. I discuss each in turn.

A

On October 29, 1992, William Leroy Barnes accompanied two other men, Robert Lewis Blakney and Frank Junior Chambers, to the home of B. P. Tutterow and his wife, Ruby, with the intent to rob them. *State* v. *Barnes*, 345 N. C. 184, 200, 481 S. E. 2d 44, 51 (1997). The three targeted the Tutterows because Chambers knew that B. P., a deputy sheriff who worked at a jail where he had been held, often carried a significant amount of cash in his

wallet. In the course of the robbery, Barnes and Chambers shot and killed the Tutterows. They then went to the apartment of some friends, where Barnes and Chambers showed off the guns they had stolen from the Tutterows.

The three men were tried together on two counts of first-degree murder, two counts of robbery with a dangerous weapon, and one count of first-degree burglary. The jury found them guilty on all counts. During the penalty phase of the trial, Chambers' attorney warned the jurors as follows that they would answer for their vote before God:

> "All of us will stand in judgment one day. . . . [D]oes a true believer want to explain to God, yes, I did violate one of your commandments. Yes, I know they are not the ten suggestions. They are the ten commandments. I know it says, Thou shalt not kill, but I did it because the laws of man said I could. You can never justify violating a law of God by saying the laws of man allowed it. If there is a higher God and a higher law, I would say not." App. to Pet. for Cert. 172a.

The jury recommended that Barnes and Chambers be sentenced to death for each murder and that Blakney be sentenced to two mandatory terms of life imprisonment.

After the jury made these recommendations, defense counsel moved to question the jury based on allegations that a juror had called a minister to seek guidance about capital punishment. Defense counsel acknowledged that there was no evidence that the juror had discussed the facts of the case with the minister. The trial court denied his motion.

On direct appeal, the Supreme Court of North Carolina concluded that the trial court did not abuse its discretion in denying that motion. It explained that "[t]he trial court was faced with the mere unsubstantiated allegation that a juror called a minister to ask a question about the death penalty" and that there was "no evidence that the content

of any such possible discussion prejudiced defendants or that the juror gained access to improper or prejudicial matters and considered them with regard to th[e] case." *Id.,* at 228, 481 S. E. 2d, at 68.

After unsuccessfully seeking state collateral review, Barnes pursued federal relief, arguing that the Supreme Court of North Carolina had unreasonably applied clearly established federal law as determined by this Court when it denied relief on his juror misconduct claim, see 28 U. S. C. §2254(d)(1). The U. S. District Court for the Middle District of North Carolina rejected that argument. The Court of Appeals reversed. *Barnes* v. *Joyner*, 751 F. 3d 229 (CA4 2014). Over a dissent, the Court of Appeals concluded that the North Carolina court had unreasonably applied this Court's decision in *Remmer* v. *United States*, 347 U. S. 227 (1954), which held that "'any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . presumptively prejudicial.'" 751 F. 3d, at 241 (quoting *Remmer, supra,* at 229; emphasis deleted)). Although *Remmer* did not provide further guidance as to what constituted "the matter pending before the jury," the panel concluded, based on the Court of Appeals' own precedents, that the death penalty generally was "the matter pending before the jury." 751 F. 3d, at 248. The court remanded the case for the District Court to consider whether Barnes could show actual prejudice from the error under *Brecht* v. *Abrahamson*, 507 U. S. 619 (1993).

B

On June 9, 2002, Jason Wayne Hurst—the second defendant involved in this petition—murdered Daniel Lee Branch after arranging to buy a pump-action shotgun from him. *State* v. *Hurst*, 360 N. C. 181, 184–186, 624 S. E. 2d 309, 314–315 (2006). As Hurst later recounted, "'[he] knew [he] was going to kill [Branch]'" as soon as

they finished scheduling the sale. *Id.,* at 185, 624 S. E. 2d, at 315 (brackets in original). The two men met in a field, where Hurst asked if he could test-fire the gun. As Branch walked into the field to set up some cans and bottles for that purpose, Hurst opened fire. Hurst shot Branch three times. His first shot struck Branch in the ribs or stomach, prompting him to yell, "'[N]o, no, don't shoot.'" *Ibid.* His second shot struck Branch in the side, causing him to fall. Hurst then walked over to Branch and shot him in the head, before taking his keys and driving off in Branch's car.

A jury convicted Hurst of first-degree murder and recommended that he be sentenced to death. The trial court adopted the recommendation. In a later petition for state collateral review, Hurst asserted that his constitutional rights were violated when a juror asked her father where she could look in the Bible for passages about the death penalty. He attached an affidavit from juror Christina Foster, in which she stated that she had "often had lunch with [her] father who worked near the courthouse" during the trial and, before deliberations, had asked him "where [she] could look in the Bible for help and guidance in making [her] decision for between life and death." App. in No. 13–6 (CA4), p. 441. Her father gave her "the section in the Bible where [she] could find 'an eye for an eye.'" *Ibid.*

The state court rejected Hurst's argument. It first noted that the U. S. Court of Appeals for the Fourth Circuit had "determined that the Bible does not constitute an improper external influence in a capital case." *Id.,* at 481–482. It then found that Hurst had "presented no evidence" that Foster's father either "knew what case juror Foster was sitting on" or "deliberately attempted to influence her vote by directing her to a specific passage in the Bible." *Id.,* at 482. The court therefore denied Hurst relief, and the Supreme Court of North Carolina summarily denied a petition for review.

Hurst then filed an application for federal relief, arguing, among other things, that the North Carolina court had unreasonably applied clearly established federal law as determined by this Court in rejecting his juror-influence claim. See §2254(d)(1). As with Barnes' application, the U. S. District Court for the Middle District of North Carolina denied relief, but the Court of Appeals reversed. *Hurst* v. *Joyner*, 757 F. 3d 389, 400 (CA4 2014). Although two judges on the panel expressed their misgivings in a concurrence, *ibid.* (opinion of Shedd, J., joined by Niemeyer, J.), the panel concluded that the earlier "holding in *Barnes* dictate[d] the same result" in Hurst's case, *id.,* at 398. The panel remanded for a further hearing on the matter to determine whether the juror's communication with her father actually prejudiced Hurst under *Brecht, supra*, at 637.

## II

This Court should have granted a writ of certiorari to review the decisions below. In recognition of the serious disruption to state interests that occurs when a federal court collaterally reviews a state-court judgment, the Antiterrorism and Effective Death Penalty Act of 1996 imposes strict limits on that review. Among those limits are the prohibitions found in §2254(d), which dictates that a federal court may not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—"

> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

We have repeatedly explained that the §2254(d) "standard is difficult to meet." *Harrington* v. *Richter*, 562 U. S. 86, 102 (2011). Yet some courts continue to misapply this "part of the basic structure of federal habeas jurisdiction." *Id.,* at 103.

One of the all too common errors that some federal courts make in applying §2254(d) is to look to their own precedents as the source of "clearly established Federal law" for purposes of §2254(d)(1), even though that provision expressly limits that category to Supreme Court precedents. See, *e.g., Glebe* v. *Frost*, 574 U. S. ___, ___ (2014) (*per curiam*) (slip op., at 3); *Lopez* v. *Smith*, 574 U. S. ___, ___ (2014) (*per curiam*) (slip op., at 6); *White* v. *Woodall*, 572 U. S. ___, ___, n. 2 (2014) (slip op., at 4, n. 2).

The Fourth Circuit's decision in *Barnes*—upon which it relied in *Hurst*—committed the same error. That court reasoned that our decision in *Remmer* "created a rebuttable presumption of prejudice applying to communications or contact between a third party and a juror concerning the matter pending before the jury." 751 F. 3d, at 241. But *Remmer* offered no specific guidance on what constituted "the matter pending before the jury." 347 U. S., at 229. Nevertheless, the Court of Appeals turned to its *own* precedents to determine whether the moral and spiritual implications of the death penalty as a general matter constituted "the matter pending before the jury." It cited its earlier decisions in *Stockton* v. *Virginia*, 852 F. 2d 740 (CA4 1988), and *United States* v. *Cheek*, 94 F. 3d 136 (CA4 1996), as setting forth a "'minimal standard'" under which "[a]n unauthorized contact between a third party and a juror concerns the matter pending before the jury when it is 'of such a character as to reasonably draw into question the integrity of the verdict.'" 751 F. 3d, at 248. Neither of those decisions is a precedent of this Court.

*Remmer* was the only proper source of "clearly established Federal law," and it provided no support for the

Court of Appeals' decision. That case involved a third party who "remarked to [a juror] that he could profit by bringing in a verdict favorable to the [defendant]." 347 U. S., at 228. The third-party communication in Barnes' case involved nothing of the sort. Instead, it concerned a juror who asked her minister a question about the death penalty generally and did not discuss the facts of the case. No precedent of this Court holds that such a communication concerns "the matter pending before the jury." Accordingly, the state court reasonably concluded that the juror's question about the death penalty generally—not the case specifically—did not concern the matter pending before the jury. Barnes, therefore, was not entitled to relief under §2254(d)(1).

Despite the obvious error in *Barnes*, that decision has already begun to distort the law of the Fourth Circuit. When presented with Hurst's claim that the North Carolina court violated clearly established federal law as determined by this Court when it denied his *Remmer* claim, §2254(d)(1), the panel deemed itself bound by *Barnes*. Even acknowledging that the affidavits submitted to the state court "did not allege that Juror Foster discussed with her father the facts or evidence that had been presented in the trial, or the status of the jury's deliberations," and that Hurst presented no "evidence that Juror Foster's father expressed any opinion about the case or attempted to influence her vote," the panel concluded that the "holding in *Barnes* dictate[d] the same result in [Hurst's] case." *Hurst*, 757 F. 3d, at 398. That conclusion was just as erroneous as the one in *Barnes* itself.

\*    \*    \*

I would have granted the writ of certiorari to review these cases. The Court of Appeals deviated from the requirements of federal law, declared two reasonable decisions of state courts "unreasonable," and put the State

to the burden of two wholly unnecessary *Brecht* hearings. It committed an error that we have repeatedly corrected, including multiple times this Term. See *supra,* at 5. Because I see no reason why these cases should be treated differently than the many others that we have reviewed for the same error, I would have granted the petition for a writ of certiorari.